14-4425-cr
United States v. Cunningham

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2015

(Argued: January 29, 2016          Decided: August 31, 2016)

Docket No. 14-4425-cr

_____

UNITED STATES OF AMERICA,

*Appellee,*

v.

FAHD HUSSAIN, aka Ali, aka Moe, JERMAINE DORE, aka St. Kitts, aka
Blaqs, DWAYNE BARRETT, aka Sealed Defendant 3, aka Tall Man, TAIJAY
TODD, aka Sealed Defendant 4, aka Biggs, TAMESHWAR SINGH, aka Sealed
Defendant 5, SHEA DOUGLAS,

*Defendants,*

DAMIAN CUNNINGHAM,

*Defendant-Appellant.*

_____

Before:

CALABRESI, LYNCH, and LOHIER, *Circuit Judges*.

Damian Cunningham appeals from a judgment of the United States
District Court for the Southern District of New York denying his motion to
suppress evidence recovered after a traffic stop and search of Cunningham's
vehicle. Cunningham contends that the search of his vehicle violated the
Fourth Amendment because the officers lacked a reasonable, articulable

suspicion that the occupants of the vehicle were presently dangerous. Relying on <u>Michigan v. Long</u>, the District Court determined after a hearing on Cunningham's motion to suppress that the officers possessed "a reasonable belief based on 'specific and articulable facts' . . . that the suspect [was] dangerous and the suspect [might] gain immediate control of weapons," entitling them to conduct the search. 463 U.S. 1032, 1049 (1983). On the record here, we are persuaded that the events identified as leading to the officer's search of Cunningham's car and recovery of the gun introduced as evidence at trial are, without more, not enough to justify a full protective search of the passenger compartment of a car based on immediate danger to the officers involved or to others. We therefore **REVERSE** and **REMAND** to the District Court for further proceedings.

JARED LENOW (Margaret Garnett, *on the brief*), *for* Preet Bharara, United States Attorney for the Southern District of New York, *for Appellee*.

IAN S. WEINSTEIN (Cathleen Benites, Ketzia Chetrite, Beatrice Collette, Danielle Rudkin, Andrew Mainardi, Christopher Ross, Legal Interns, *on the brief*), Lincoln Square Legal Services, Fordham University School of Law, *for Defendant-Appellant*.

LOHIER, *Circuit Judge*:

Damian Cunningham was convicted after a jury trial of participating in

a robbery conspiracy (Count One) and using and carrying firearms during

and in relation to the robbery conspiracy (Count Two). During the trial, the

Government introduced a gun that an officer of the New York City Police

Department ("NYPD") found while searching Cunningham's car during a

2

traffic stop.  The primary issue we consider is whether the search violated the Fourth Amendment.  Citing Michigan v. Long, the United States District Court for the Southern District of New York (Sullivan, J.) determined after a hearing on Cunningham's motion to suppress evidence of the gun that the officers possessed "a reasonable belief based on 'specific and articulable facts' . . . that the suspect [was] dangerous and the suspect [might] gain immediate control of weapons," entitling them to conduct the search.  463 U.S. 1032, 1049 (1983) (citing Terry v. Ohio, 392 U.S. 1, 21 (1968)).

Appeals based on the Fourth Amendment from denied motions to suppress evidence of illegal weapons or contraband (drugs, etc.) are often difficult because the Government is in a sense proven right.  Whatever prompted the search (a hunch, suspicion, luck, reasonable belief, or probable cause), incriminating evidence was found.  The urge to defer to the assessment of the district judge, particularly one as knowledgeable and experienced as Judge Sullivan, only intensifies our difficulty, as does a set of facts implicating officer safety.  On the record here, though, we are persuaded that the events identified as leading to the search of Cunningham's car and recovery of the gun introduced as evidence at trial are, without more, not

3

enough to justify a full protective search of the passenger compartment of a car based on immediate danger to the officers involved or to others. We therefore **REVERSE** and **REMAND** to the District Court for further proceedings.

**BACKGROUND**

At trial the Government proved that Cunningham participated in a robbery conspiracy. It offered compelling evidence that a co-conspirator, Fahd Hussain, routinely identified potential robbery targets to Bronx-based robbery crews. After receiving Hussain's tip, the crews robbed the targets and sent Hussain the non-cash proceeds to convert into cash. Cunningham belonged to a robbery crew composed of black Jamaicans.

We do not consider in the abstract whether Cunningham's crew was dangerous and violent. It undoubtedly was. In one robbery in October 2011 (described by the Government at trial as the "snowy day robbery"), for example, Cunningham and fellow crew members Jermaine Dore and Dwayne Barrett kidnapped Ahmed Salahi, eventually stealing $15,000 from Salahi's home. During the robbery, Cunningham held Salahi hostage with a knife.

4

Salahi testified that Cunningham then grabbed a gun and pointed it at Salahi's head.

The central issue on appeal is whether the District Court should have suppressed evidence of a loaded gun seized by the police as a result of a search of Cunningham's car and introduced as evidence during Cunningham's trial. At the suppression hearing the District Court credited the NYPD officers' description of the car stop and subsequent search, and we accept their description as true for the purpose of resolving Cunningham's challenge.

The car search occurred at around 10:30 pm on December 26, 2011, a few months after the Salahi robbery. Cunningham was driving a Nissan Maxima in the Bronx with another crew member, Lacey Scott. They were on their way to commit a robbery based on yet another tip from Hussain. NYPD Officers McAloon and Maudsley were driving in an unmarked police car just behind Cunningham's Maxima for some time, but at first neither officer noticed "anything unusual about the car." While driving at a "normal rate of

speed," Cunningham illegally ran a stop sign in front of the officers.[1] Officer McAloon turned on the police car's lights and sirens. Cunningham drove for about "half the block" or between "five to ten seconds" on a road where cars were parked on both sides of the street. He finally pulled over to what appears to have been an open spot next to the curb in the middle of the block.[2] Joint App'x 119. Thereafter, Officers McAloon and Maudsley testified based on their different vantage points of the stop and search, which we recount below.

As the Maxima slowed to a stop, Officer McAloon observed Cunningham's arm move up and down in the middle console area. Supp. App'x 110. Officer McAloon then got out of the police car, approached the driver's side of Cunningham's car, and saw Cunningham with a cellphone "in his [right] hand up to the side of his head." Supp. App'x 112. Officer

---

[1] On appeal, Cunningham does not contest that he committed a traffic violation.

[2] Officer McAloon acknowledged that Cunningham's car would have been double-parked and "blocked the rest of the traffic on [the] street" had he pulled over any sooner. Supp. App'x 109. He also agreed that Cunningham did not commit a separate infraction by failing to immediately pull over.

6

McAloon asked Cunningham to put down the phone, but Cunningham didn't immediately respond. Officer McAloon then asked Cunningham to "produce his license and registration." Supp. App'x 113. Cunningham again failed to respond immediately. After Officer McAloon asked again for his license and registration, Cunningham "started fumbling around the center console and then . . . reached for the glove compartment." Supp. App'x 113-15. At that point, Officer McAloon, fearing for his safety, ordered Cunningham out of the car. This time, Cunningham listened and got out of the car right away. Officer McAloon asked him if he had any weapons. Cunningham responded that he had a knife in his pocket. Joint App'x 109. Officer McAloon then frisked Cunningham, recovered a legal pocketknife with a two- or three-inch blade from Cunningham's pocket, and said "knife" out loud.[3] Joint App'x 143; Supp. App'x 55.

After recovering the pocketknife, Officer McAloon directed Cunningham to move to the back of the Maxima where, as described below,

---

[3] Officer McAloon did not determine that the pocketknife was illegal. And throughout this litigation, the Government has acknowledged that Cunningham's pocketknife was, in fact, legal.

7

Officer Maudsley and Scott were already located.  Cunningham walked to the back of the Maxima without handcuffs.  At trial, Officer McAloon explained that he saw "no need to handcuff" Cunningham because "[i]n [his] experience . . . [Cunningham] was being compliant and he indicated he had a weapon, so I brought him to the back of the car.  There was no need to handcuff him at that time."  Joint App'x 520.  After directing Cunningham to the back of the car and without speaking to Officer Maudsley, Officer McAloon immediately returned to the driver's side of the car, searched it, and recovered the loaded gun at issue in this case underneath the front passenger seat, where Scott had been sitting.

We turn next to the testimony of Officer Maudsley.  As Officer McAloon approached the driver's side of Cunningham's car, Officer Maudsley approached the passenger side where Scott was sitting.  From behind the car, Officer Maudsley initially saw Cunningham move his right arm in the center console area and pick up a smartphone.  Supp. App'x 22-23 ("The right arm moves up and down from the middle area and it comes back up with what appears to be an iPhone and it moved back down out of the sight and back up again several times.").  As Officer Maudsley moved to the

8

side of the car, he saw that Scott's hands were "in plain view and [] did not move" while his shoulder "protrude[d]" into the console area from the passenger side. Supp. App'x 22-23, 49. Officer Maudsley described Scott as sitting in an "unnatural" position that suggested Scott was trying to obstruct the officers' view of the car interior. Specifically, Officer Maudsley testified, the "left portion of [Scott's] body was too far left into the middle area where you would not be seated. The left shoulder was moved towards the driver's side of the vehicle and the body was canted where the left hip was slightly rotated in an upward position." Supp. App'x 31. There is no evidence in the record that Officer Maudsley conveyed what he saw (that is, Scott sitting in an "unnatural position") to Officer McAloon before the latter started to search the Maxima. At some point, Officer Maudsley heard Officer McAloon say "knife," whereupon Officer Maudsley opened the passenger side door and told Scott to get out of the car. Scott complied. Officer Maudsley frisked Scott and found nothing. He then escorted Scott, without handcuffs, to the back of the Maxima. Joint App'x 90-91; Supp. App'x 55. As described above, Cunningham soon joined Scott at the back of the car. Both men faced away

from the Maxima toward Officer Maudsley while Officer McAloon searched the passenger compartment of the car. Neither officer called for backup.

As Officer McAloon continued his search, Cunningham started to fidget and repeatedly looked back over his shoulder. Officer McAloon then said "lunch," a code word the officers used to signify the presence of a firearm. At that point, Scott ran. Apparently, "lunch" meant something to him too. Scott was eventually caught, and both he and Cunningham were arrested. The Maxima was later subjected to a standard inventory search at the police precinct, where the police found duct tape and gloves in the trunk.

The indictment charged Cunningham with participating in a robbery conspiracy (Count One) and using and carrying firearms during and in relation to the robbery conspiracy (Count Two). After two suppression hearings (one for Scott, who was also indicted, and another for Cunningham), the District Court ruled that Officer McAloon's warrantless search of the Maxima was lawful under the officer safety exception set forth in Michigan v. Long. Joint App'x 165-70. It separately ruled that the duct tape and gloves found in the trunk of the Maxima as a result of the inventory search were admissible under the doctrine of inevitable discovery, since the car was the

subject of an inventory search once the gun was found and Cunningham and Scott were arrested. Joint App'x 169-70. The District Court declined to consider the Government's alternative argument that Officer McAloon could have searched the car initially based on probable cause to believe that the car contained evidence of contraband. Joint App'x at 170.

At trial, the Government introduced into evidence the gun that Officer McAloon recovered during the December traffic stop. The jury found Cunningham guilty on both counts.

This appeal followed.

**DISCUSSION**

At the outset, we briefly address Cunningham's argument that the evidence was insufficient to convict him of the gun charge (Count Two). To prevail in his challenge, Cunningham needed to show that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Aguilar, 585 F.3d 652, 656 (2d Cir. 2009). At trial, Salahi testified that a masked robber initially held him down with a

knife then grabbed a gun from his confederate and pointed it at Salahi's head, demanding that Salahi reveal where his money was hidden.[4] Taylor testified that Cunningham later confided that he held a victim hostage at knifepoint. The jury could well and reasonably infer from this evidence that Cunningham actually possessed the gun after holding the knife.[5] The trial evidence was therefore clearly sufficient to support Cunningham's conviction when considering the trial evidence "in the light most favorable to the prosecution." Id.

Cunningham's main argument, of course, is not about the sufficiency of the evidence against him. It is that the District Court should have granted his

---

[4] Cunningham alternatively argues that Salahi's testimony was inconsistent. He points out, for example, that Salahi suggested during his testimony that there were three men with him in the van when he was threatened. But the jury was in a position to evaluate these inconsistencies and assess Salahi's credibility or ability to recall events. In any event, Salahi later clarified that there were only two robbers in the van: a robber with a gun and a robber with a knife.

[5] The Government prosecutor argued as much in his summation: "The government is charging and this case is about actual possession of a gun, which should be apparent from the facts I just described. Damian Cunningham, the defendant, grabbed the gun and pressed it against the forehead of Ahmed Salahi. That's not aiding and abetting. That's possession." Joint App'x 763-64.

12

motion to suppress evidence of the gun (and, therefore, the duct tape and gloves) recovered by the officers during the traffic stop. In an appeal from a suppression decision, we review the district court's legal rulings, including its reasonable suspicion determination, de novo, see United States v. Arvizu, 534 U.S 266, 275 (2002); United States v. Stewart, 551 F.3d 187, 190-91 (2d Cir. 2009), and its factual findings for clear error, "giving special deference to findings that are based on determinations of witness credibility," United States v. Lucky, 569 F.3d 101, 106 (2d Cir. 2009).

In Michigan v. Long, the Supreme Court held that "the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." 463 U.S. at 1049 (citing Terry v. Ohio, 392 U.S. 1, 21 (1968)); see id. at 1051 ("[T]he balancing required by Terry clearly weighs in favor of allowing the police to conduct an area search of the passenger compartment to uncover weapons, as long as they possess an

13

articulable and objectively reasonable belief that the suspect is potentially dangerous."). "Reasonable suspicion requires more than 'inchoate and unparticularized suspicion or hunch.'" United States v. Elmore, 482 F.3d 172, 178 (2d Cir. 2007) (emphasis added) (quoting Alabama v. White, 496 U.S. 325, 329 (1990)). Police "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion [on a citizen's liberty interest]." Id. at 178-79.

"Like probable cause, reasonable suspicion is determined based on the totality of the circumstances but 'the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.'" Id. at 179 (quoting Arvizu, 534 U.S. at 273–74). Fundamentally, then, we consider "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Long, 463 U.S. at 1050. A suspect "may gain" control over a weapon in a car both when the police

have restrained him _and_ after he is let go and permitted to get back in the car.[6] Id. at 1049, 1051-52.

Long's requirement of present dangerousness is based on the premise set forth in Terry that the search must be genuinely protective. Where the search has a purely evidentiary rather than protective purpose, a protective search is inappropriate and Long is inapplicable. In those circumstances we demand a warrant (or some other exception to the warrant requirement). See id. at 1046 (noting that "[i]n Terry, the Court examined the validity of a 'stop and frisk' in the absence of probable cause and a warrant"); Terry, 392 U.S. at 29 ("Suffice it to note that [a protective] search, unlike a search . . . incident to a lawful arrest, is not justified by any need to prevent the disappearance or destruction of evidence of crime.")

Cunningham first argues that the District Court "conflated the elements of Long's two-factor test" by considering only whether the police had an

---

[6] As a result, that Cunningham and Scott were already out of the Maxima and detained when Officer McAloon began his search is not dispositive, since we also consider whether there were reasonable grounds to think that they could have accessed a weapon after returning to the car.

15

articulable suspicion that there was a weapon in the car. We are not persuaded. In fact, the District Court considered both dangerousness and access to weapons. It first concluded that the police officers reasonably suspected that Cunningham was dangerous because he was carrying a knife. It then determined that the circumstances surrounding the car stop justified a reasonable suspicion that Cunningham and Scott had access to weapons inside the car.

But discerning whether the District Court considered both factors under Long is the start, not the end, of our analysis. The more difficult question is whether it did so properly to determine that the officers reasonably suspected that Cunningham and Scott posed an immediate danger – that is, whether its holding is supported by the record.

In arriving at its conclusion that the officers reasonably suspected that the men posed such a danger, the parties agree, the District Court highlighted three central facts: first, Officer Maudsley saw Cunningham move his arm toward the center console of the car; second, Officer Maudsley observed Scott seated in an "unnatural" position that appeared designed to block the officer's view of the inside of the car; and third, Officer McAloon recovered a

16

knife from Cunningham. It is worth quoting the District Court's precise

description of these facts on which it relied to deny Cunningham's motion:

> First, upon approaching the vehicle, Officer Maudsley saw the defendant move his arm towards the center console area of the car. Second, Officer Maudsley observed that Scott's body was in an unnatural position as if covering something up or hiding something. Third, when Officer McAloon frisked the defendant, he found a knife on him and I think there was also testimony that defendant acknowledged that he had a knife. Behavior suggesting that a vehicle's occupants are trying to conceal a weapon and then the discovery of an actual weapon on one of those occupants is, in my mind, sufficient to create an articulable suspicion that the vehicle [may] contain a weapon.

Joint App'x at 168. We would add to the District Court's list of central facts

Cunningham's refusal to immediately comply with the officer's instruction to

put down his phone. See United States v. Paulino, 850 F.2d 93, 95- 97 (2d Cir.

1988) (upholding search for weapons under car floor mat after defendant was

observed making furtive movement in that direction).

We ultimately agree with Cunningham that the officers did not have a

reasonable and articulable suspicion of danger justifying the search of

Cunningham's car as protective, as Long requires. But our agreement with

Cunningham on this dispositive point should not be misunderstood. We

have no reason to doubt that each of the officers subjectively suspected that Cunningham and Scott were hiding something and up to no good. And the circumstances of the traffic stop may well have supported a "hunch" – one that was soon confirmed when Officer McAloon found the gun. We also think (and Cunningham does not seriously dispute) that the officers had a basis for asking Cunningham and Scott to step out of the car. As the Supreme Court explained in Knowles v. Iowa, "the concern for officer safety" exists even "in the case of a routine traffic stop." Knowles v. Iowa, 525 U.S. 113, 117-18 (1998).

"But while the concern for officer safety in this context may justify the 'minimal' additional intrusion of ordering a driver and passengers out of the car, it does not by itself justify the often considerably greater intrusion attending a full field-type search." Id. In this case, the specific facts articulated by the officers fail to demonstrate that their fear of immediate danger was objectively reasonable so as to justify a full field-type search of Cunningham's car. Part of our trouble is that stops fitting the same fact pattern (but, say, different passengers of another race, gender, or ethnicity) would, we think, rarely if ever lead the police to suspect the passengers posed

18

an immediate danger and justify a protective search of the passenger compartment. Put another way, allowing a protective search on these bare facts would sweep too broadly. Whatever extra fact prompted Officers McAloon and Maudsley to harbor a suspicion of dangerousness that we might accept as reasonable, it was left unsaid on the record before us.

We explain our decision in more detail by referring to the specific facts to which the officers pointed and on which the District Court relied in denying Cunningham's motion.[7]

As an initial matter, the District Court relied on the fact that Officer Maudsley observed Cunningham's right arm move toward the console area. But Officer Maudsley testified that Cunningham had what appeared to be a smartphone in his right hand when he made those movements. And Officer McAloon confirmed that Cunningham already had a smartphone in his right

---

[7] Although one of the officers described the precinct in which the traffic stop occurred as a "high crime area," neither the officers nor the District Court relied on that fact in justifying the search of the Maxima. In any event, that the car was stopped while <u>driving</u> <u>through</u> a high crime area does not alter our analysis. <u>Cf.</u> <u>Holeman v. City of New London</u>, 425 F.3d 184,190 (2d Cir. 2005) ("[I]n the dead of night in a high crime neighborhood, it would be more suspicious to be on foot than in a car.").

hand by the time Officer McAloon approached the driver side of the Maxima.

We recognize that it is the totality of the facts and unfolding events that matter. But we are hard pressed to see how a driver in a high crime area in the Bronx (or anywhere else, for that matter) moving his right arm and hand around the center console to retrieve a smartphone can reasonably suggest that danger lurks any more than a suburban father or mother reaching for a smartphone from the center console after a traffic stop to call a spouse or relative could be considered dangerous. This case is therefore distinguishable from Paulino, where the defendant was observed "in the back seat moving his torso and bending over as if placing an object on the floor," but "the officer was unable to see [the defendant's] hands or the object." 850 F.2d at 94. Here, one of the officers was able to see that the defendant was holding a smartphone in the hand that had been moving and continued moving, and the other officer confirmed that the defendant had a smartphone, not a weapon, in his hand when the officer approached the car.

Next, we consider Cunningham's failure to immediately comply with the initial directions of the officer during the stop – although, again, the District Court did not explicitly rely on this evidence in denying the motion to

20

suppress.  As we have explained, it took Cunningham "five to ten seconds" to stop after the officers turned on their patrol car lights and siren.  Cunningham failed to put down his phone as soon as Officer McAloon asked him to do so.  And when Officer McAloon asked Cunningham to "produce his license and registration," Cunningham again failed to respond right away.  It was only after Officer McAloon asked again for his license and registration that Cunningham "started fumbling around the center console and then . . . reached for the glove compartment."  We do not mean to minimize the actual danger that police officers face every day.  Cunningham's delayed responses at the early stages of his encounter with the police officers may have raised various suspicions – that he could not understand them, that he was not licensed to drive, that he was under the influence of alcohol or narcotics, that he was hiding contraband, and so on.  But the officers did not point to any other specific facts suggesting that Cunningham's failure immediately to comply with Officer McAloon's commands justified a reasonable suspicion that he or Scott was <u>dangerous</u>.

Nor are we persuaded by the additional fact that Scott was seated in an "unnatural" position in the passenger seat.  As noted above, Officer Maudsley

21

described Scott's position in some detail.  Among other things, he testified that Scott was sitting "unnatural[ly]" close to the middle area of the Maxima, where Officer Maudsley had just seen Cunningham holding a smartphone. That may have been enough to believe that Scott sought to hide something. But insofar as dangerousness is the sole focus of our attention under Long, Scott's position by itself sheds insufficient light on whether he was hiding something dangerous.  As we have also already noted, there was no evidence that Officer Maudsley ever conveyed his observations of Scott to Officer McAloon (or that Officer McAloon saw Scott sitting in an unnatural position) before Officer McAloon started to search the Maxima.  Indeed, there is no evidence in the record that Officer Maudsley communicated anything to Officer McAloon once the officers walked up to the Maxima.[8]  In addition,

---

[8] Absent record evidence that Officer Maudsley communicated his suspicion or any relevant information to Officer McAloon before the latter began to conduct the protective search, we will not impute his knowledge or reasonable suspicion to Officer McAloon under the doctrine of collective knowledge.  That doctrine allows a court to impute an officer's knowledge to another officer who actually makes a stop or conducts a search, even if the latter does not possess all the relevant facts.  See United States v. Colon, 250 F.3d 130, 135-38 (2d Cir. 2001).  In other words, it permits the "police . . . to act on the strength" of work done by fellow officers.  Whiteley v. Warden Wyo.

22

Officer Maudsley acknowledged that Scott was immediately compliant when instructed to get out of the car, frisked, and escorted to the back of the Maxima.

Finally, the District Court also relied on the presence of a legal folding pocketknife as evidence to support the officer's reasonable suspicion that Cunningham, at least, was dangerous. In doing so, the District Court appears to have operated under a factual misimpression in one material respect. The court suggested that Officer McAloon frisked Cunningham, found a knife,

State Penitentiary, 401 U.S. 560, 568 (1971). Reasonable suspicion can therefore be premised in whole or in part on the knowledge of the officer conveying the information, not on "whether those relying on the [information] were themselves aware of the specific facts which led their colleagues to seek their assistance." United States v. Hensley, 469 U.S. 221, 231 (1985). But we decline to extend the collective knowledge doctrine to cases where, as here, there is no evidence that an officer has communicated his suspicions with the officer conducting the search, even when the officers are working closely together at a scene. Cf. Colon, 250 F.3d at 136-37 & n.3 (2d Cir. 2001) (citing United States v. Shareef, 100 F.3d 1491, 1504 & n.5 (10th Cir.1996) (declining to extend collective knowledge doctrine where evidence showed officers had not communicated with each other; "[i]nformation scattered among various officers in a police department cannot substitute for possession of the necessary facts by a single officer related to the arrest.") (quotation marks omitted)); Terry, 392 U.S. at 21-22 (requiring that courts "evaluate the reasonableness of a particular search or seizure" based on the "facts available to the officer at the moment of the seizure").

and that Cunningham then acknowledged that he had the knife. Joint App'x 168. By emphasizing this point, the District Court may have misunderstood that Cunningham was throughout the encounter less compliant with the police than the record demonstrates. In fact, Officer McAloon testified that he asked Cunningham whether he had any "weapons," that Cunningham readily volunteered that he had a knife in his pocket, and that Officer McAloon thereafter frisked him and recovered the knife. Officer McAloon further testified that Cunningham was fully compliant when he was asked to get out of the car.

Prodded by the Government, the District Court also may have overstated the description of the knife as a dangerous "weapon" that signaled the presence of other weapons in the car. We recognize that a criminal is capable of turning just about anything into a weapon: a knife, scissors, a tire iron. Here, for example, the Government argued that Cunningham's pocketknife resembled the knife he used to threaten Salahi a few months before the traffic stop. But the Government acknowledges that Cunningham's "weapon" was a lawful pocketknife with a two- or three-inch blade. Joint App'x 416; Or. Arg. Tr. 27. By comparison, we note, the official

24

pocketknife licensed by the Boy Scouts of America (and used by Eagle Scouts) has a three-inch blade, while the blade on the ubiquitous Swiss Army knife is also usually two inches or longer.

On this record, we are simply not convinced that the circumstances prior to the search of the Maxima supported a <u>reasonable</u> suspicion on Officer McAloon's part that Cunningham and Scott were dangerous and that the car contained a weapon. On the same facts, imagine police officers searching the passenger compartment of a car driven by two women (or, for that matter, two people who appear to be businessmen) stopped at night on the ground that: the driver took ten seconds to pull the car over to the curb; her hand moved in the center console area <u>to retrieve a smartphone</u>; she continued to speak on the phone and was slow to respond when asked to put it down; she disclosed, when asked, that she possessed a pocketknife; and both the driver and the passenger fully complied with the officers' instructions after being asked to step out of the car. Let us even imagine that the passenger appeared to both officers to be hiding something. Virtually everyone will agree that the police officer under those circumstances would have overstepped if they conducted a protective search of the passenger compartment on the ground

that the women (or the businessmen) were dangerous and might gain immediate control of a weapon. Yet the Government presses only those facts and circumstances to ask us to affirm the denial of Cunningham's suppression motion in this case. We might have been convinced to do so had the Government proffered some additional facts for our appellate review to support the officers' suspicion of immediate dangerousness. On this record, however, we have little choice but to reverse.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court is

**REVERSED** and **REMANDED** to the District Court for further proceedings.[9]

---

[9] After oral argument, Cunningham moved for an order (1) holding his appeal in abeyance pending decision by this Court in United States v. Dwayne Barrett, No. 14-2641-cr, or (2) granting permission to file a supplemental brief based on the Supreme Court's decision in Johnson v. United States, 135 S. Ct. 2551 (2015). We deny the motion as moot.