*Dwayne Scott Lockard v. State of Maryland*, No. 3289, September Term 2018.  Opinion by Beachley, J.

**_TERRY_ FRISK—REASONABLE ARTICULABLE SUSPICION—TOTALITY OF CIRCUMSTANCES—PRESENCE OF A KNIFE—OFFICER'S SUBJECTIVE LACK OF FEAR**

On the night of July 23, 2018, a Frederick County Deputy stopped a vehicle for following another vehicle too closely.  Appellant Dwayne Lockard was the front seat passenger; Jenna Clark was the driver.

Shortly thereafter, K-9 officer Corporal Adkins and two other officers arrived on the scene.  Because Corporal Adkins prefers vehicles to be unoccupied when he performs canine scans, he ordered both Ms. Clark and Lockard to exit the vehicle.

Once Lockard exited the vehicle, Corporal Adkins instructed him to walk to the three other officers who were on the scene.  As Lockard began to walk in their direction, Corporal Adkins observed a knife in Lockard's pocket.

After another officer secured the knife, Corporal Adkins asked Lockard if he would consent to a pat-down for weapons.  Without verbally responding, Lockard turned away from Corporal Adkins and placed his hands in the air.  Corporal Adkins began frisking Lockard by feeling around his waistband area, and in doing so, immediately felt what he recognized to be narcotics.

Lockard moved to suppress the narcotics, arguing that Corporal Adkins discovered them as the result of an illegal frisk.  At the hearing on Lockard's motion, the suppression court found that Lockard's possession of the knife constituted reasonable articulable suspicion to justify the *Terry* frisk.  Lockard timely appealed.

*Held*: Judgment vacated.  In order for a *Terry* frisk to be lawful under the Fourth Amendment of the United States Constitution, the officer must have reasonable articulable suspicion that the person with whom he or she is dealing is armed and dangerous.  In reviewing whether there is reasonable articulable suspicion, suppression courts must consider the totality of the circumstances, including reasonable inferences from particularized facts in light of the officer's experience. The test is objective; the validity of the frisk is determined by whether the record discloses articulable objective facts to support the frisk.

Although the test is objective, an officer's subjective belief that the suspect is (or is not) armed and dangerous is also a relevant consideration in the totality of circumstances calculus.

Here, Corporal Adkins did not subjectively believe that he had reasonable articulable suspicion to conduct a protective frisk. Although the test is whether the officer objectively had a reasonable belief that the suspect was armed and dangerous, an officer's subjective belief is a relevant consideration in the totality of circumstances calculus.

In addition to the fact that Corporal Adkins did not subjectively believe Lockard was armed, the other circumstances failed to support a *Terry* frisk: the knife had already been secured, there were four police officers on the scene to control Lockard and Ms. Clark, and Lockard was polite and cooperative. Corporal Adkins's assertion that "if there's one weapon, there could be more," was insufficient to justify a *Terry* frisk.

Judgment vacated and case remanded for a new trial.

Circuit Court for Frederick County
Case No. C-10-CR-18-000771

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 3289

September Term, 2018

_____

DWAYNE SCOTT LOCKARD

v.

STATE OF MARYLAND

_____

Nazarian,
Beachley,
Battaglia, Lynne A.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Beachley, J.

_____

Filed: July 29, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

We are called upon in this case to etch another inscription upon a monument of criminal procedure jurisprudence:  *Terry v. Ohio*, 392 U.S. 1 (1968).  Appellant, Dwayne Scott Lockard, asks whether the suppression court erred in concluding that "police had reasonable suspicion to perform a '*Terry* search' of Mr. Lockard's person after observing, and removing, a closed folding knife from his pocket where there was no other indication that Mr. Lockard was armed or otherwise dangerous."[1]  We conclude that the police did not have reasonable articulable suspicion that Lockard was armed and dangerous as required to support a lawful *Terry* frisk.  We shall therefore hold that the Circuit Court for Frederick County erred in denying Lockard's motion to suppress the controlled dangerous substances the police seized from him as a result of the unlawful frisk.

## FACTUAL AND PROCEDURAL BACKGROUND

At approximately 11:20 p.m. on July 23, 2018, Frederick County Deputy Douglas Story was on patrol in his marked police cruiser when he observed a Ford Escort traveling westbound on Interstate 70 near Middletown, Maryland.  Deputy Story stopped the Ford Escort because it was following another vehicle too closely.

Before exiting the vehicle, Deputy Story ran the vehicle's registration and determined that the owner, Jenna Clark, had been charged with possession of heroin only two weeks earlier.  Deputy Story then approached the vehicle and identified Ms. Clark as the driver and Lockard as the front seat passenger.  During the course of the stop, Deputy

---

[1] In his brief, Lockard also asserts that the search exceeded the proper scope of a search permitted by the "plain feel doctrine."  Because we conclude that the *Terry* frisk was improper, we need not address Lockard's "plain feel" argument.

Story noticed that Ms. Clark had track marks on her left forearm, which he believed were indicative of intravenous drug use. The track marks were "scabbed a little," which suggested they were "pretty recent." Ms. Clark's arms and hands were shaking when she handed over her identifying information. Ms. Clark told him that she was coming from the Rosemont area in Frederick, but Deputy Story knew this to be false because he had recently seen this same vehicle on Interstate 70 east of Frederick near New Market.

After Ms. Clark and Lockard both provided their identifying information, Deputy Story went back to his patrol vehicle in order to run warrant and license checks, and call for a K-9 unit. Because Deputy Story discovered that Ms. Clark potentially had an open warrant in Washington County, he detained her pending verification that the warrant was still active.

Shortly thereafter, the K-9 officer, Corporal Adkins, and two other officers, including Maryland State Trooper First Class Frye, arrived on the scene.[2] Corporal Adkins, who had been employed with the Frederick County Sheriff's Office since 2005 and assigned as a canine officer since 2013, testified that he and his K-9 partner, Rango, responded to the scene of the traffic stop at around 11:24 p.m. Because Corporal Adkins prefers to conduct canine scans of unoccupied vehicles, he ordered both Ms. Clark and Lockard to exit the vehicle prior to the canine scan. At the hearing on Lockard's motion to suppress, Corporal Adkins described the events as follows:

---

[2] Neither Corporal Adkins's nor Trooper Frye's first names are included in the record.

[THE STATE]: Okay. Once you had the front seat male passenger identif[ied] as Mr. Lockard step out of the vehicle, what happened next?

[CORPORAL ADKINS]: I instructed him to walk to the back towards other deputies and a trooper who was on scene. As he was doing so, I noticed that there was a knife in his pocket.

[THE STATE]: Okay. And upon observing that, what did you do?

[CORPORAL ADKINS]: I relayed my observations, it was something to the effect of, hey, Frye, who was, it was Trooper First Class Frye who was on scene, he's got a knife in his pocket.

[THE STATE]: Okay. And what did, what did you observe about the -- what did you observe to know that there was a knife in his pocket?

[CORPORAL ADKINS]: I just saw like the, the hammer portion sticking out of the top of the pocket like something that you would use to flip the knife open with.

[THE STATE]: And upon making that observation, you said you yelled at Trooper Frye, or advised Trooper Frye of it. What, if anything, did you, what, if anything, did you observe after that, okay?

[CORPORAL ADKINS]: Trooper Frye went ahead and removed the knife --

[THE STATE]: Okay.

[CORPORAL ADKINS]: -- for the time, time being.

3

According to Corporal Adkins, the knife was "sticking partially out" of Lockard's pocket when he relayed the information to Trooper Frye. As noted, Trooper Frye promptly secured the knife, which was described as a silver "folding knife" with the blade folded or closed.[3] Corporal Adkins then articulated the primary reason for the frisk, stating, "I wanted to, at that point, based on that knife, I felt like I should, I wanted to be able to make sure he didn't have any further weapons on him[.]" Corporal Adkins asked Lockard if he would consent to a pat-down for weapons, and Lockard then "faced away from [Corporal Adkins] and held his hands in the air." Corporal Adkins interpreted Lockard's action as impliedly consenting to the request. On cross-examination, defense counsel inquired about the reason for the frisk:

> [DEFENSE COUNSEL]: You indicated you believed you needed to conduct a frisk for weapons for Mr. Lockard once he was outside of the vehicle, correct?
>
> [CORPORAL ADKINS]: I didn't say I needed to. I asked him if I could. I didn't, you know, I didn't need to. If I needed to, if I had to, I would have. *If I had reasonable, articulable suspicion, I would have just searched or frisked him.*

(Emphasis added).

On redirect examination, Corporal Adkins stated that Lockard's possession of the knife raised a concern that "[i]f there's one weapon, there could be more," and "if he had a knife, what's saying that there couldn't be something, another weapon on his person

---

[3] At oral argument, the parties agreed that there was no evidence in the record whether the knife could be legally possessed under Maryland law.

4

along with that knife?"  Regarding Lockard's demeanor, Corporal Adkins indicated that Lockard was neither threatening nor aggressive.  Deputy Story characterized Lockard as "polite and cooperative."

Corporal Adkins explained that he commenced the frisk at Lockard's waistband because "[t]hat's a place that's easy to conceal a weapon.  Usually there's a belt or the tightness of the pant will allow somebody to slip a weapon in that will hold the weapon there, kind of securing it without a holster."  He continued:

> So, when I do that, I, I've been trained that it's not, I'm not looking for narcotics or anything like that.  I'm solely feeling in the area, feeling the defendant for any weapons on his person that could harm me.  So, basically, I'm only looking for weapons on the person.  I'm not going in the pockets, I'm not manipulating objects unless I believe they're [sic] a weapon or anything like that.

Corporal Adkins then testified:

> So, as I am conducting my frisk for weapons, I am, my, I started, I believe, in the front.  As I'm sliding my fingers across the waistband to feel for any objects that are weapons, my, I, as I'm dragging my hand, I immediately feel what I recognize was a bag with individual capsules in it, a significant account.

Based on his "training and experience in dealing with narcotics," Corporal Adkins believed that the large number of capsules concealed in Lockard's waistband gave him probable cause to arrest Lockard.[4]  After securing Lockard with handcuffs, Corporal Adkins removed from Lockard's waistband a plastic bag containing suspected heroin capsules.

---

[4] Although Lockard asserts that Corporal Adkins exceeded the permissible scope of a "plain feel" search, he does not contest Corporal Adkins's determination that the amount and location of the capsules provided probable cause for an arrest.

After hearing argument, and after noting that the State abandoned any argument that Lockard consented to the frisk, the court denied the motion to suppress. The suppression court found, in pertinent part, as follows:

> However, I do find that the officers had reason and justified and [sic] asking Mr. Lockard to vacate or exit the vehicle and that is for them to conduct the, I'll call it the canine scan of the vehicle.
>
> When he did that, they observed, and is walking back, they observed the handle of the knife or part of the knife protruding from his pocket. Certainly, it was recovered from him with no objection from Mr. Lockard, nothing inappropriately there. But his having one weapon on him, when you, that gives the officers a reasonable, articulable suspicion that there might be other weapons and, therefore, I do find that a *Terry* search is appropriate and a pat-down is appropriate.
>
> In this case, Officer Adkins testified, or Deputy Adkins testified that he knows what he can and cannot do. He was not searching for drugs. But when he comes upon drugs, or what he believes to be drugs with the packaging, and he's doing an appropriate search along the waistband, which is where he usually goes first for weapons, which is appropriate, it doesn't mean you, that's not the, that will be the only place, but that's where you go first is the waistband area, and he feels what he believes to be contraband based upon his feel and touch, I find nothing wrong with that in this case. And I, therefore, find that the seizure was appropriate and the motion to suppress is denied.

After waiving his right to a jury trial, Lockard pleaded not guilty on an agreed statement of facts. The court found Lockard guilty of possession of fentanyl with intent to distribute. Consistent with the State's recommendation for sentencing, the court sentenced Lockard to a term of twenty years' imprisonment with all but twelve suspended, to be followed by three years' supervised probation. This appeal followed.

6

**DISCUSSION**

Lockard contends that the motions court erred in denying his motion to suppress because, once police seized the knife from his pocket, a further search for weapons was unreasonable. The State responds that the frisk was reasonable under the totality of the circumstances and the seizure of the capsules was lawful under the plain feel doctrine.[5]

We hold that, because the police did not have reasonable articulable suspicion to believe Lockard was armed and dangerous at the time of the frisk, the frisk was unlawful and, therefore, the evidence should have been suppressed.

*Standard of Review*

On appeal, this Court reviews "a hearing judge's ruling on a motion to suppress evidence under the Fourth Amendment" by considering "only the facts generated by the record of the suppression hearing." *Sizer v. State*, 456 Md. 350, 362 (2017) (citing *Longshore v. State*, 399 Md. 486, 498 (2007)). We consider that evidence in the light most favorable to the party that prevailed on the issue raised as grounds for suppression. *Id.* (citing *Longshore*, 399 Md. at 498).

"Suppression rulings present a mixed question of law and fact. We recognize that the '[hearing] court is in the best position to resolve questions of fact and to evaluate the credibility of witnesses.'" *Thornton v. State*, 465 Md. 122, 139 (2019) (alteration in original) (citation omitted) (quoting *Swift v. State*, 393 Md. 139, 154 (2006)).

---

[5] At oral argument, the State withdrew its argument that Lockard was properly searched incident to arrest based on the officer's observation of the knife in Lockard's pocket.

"Accordingly, we defer to the hearing court's findings of fact unless they are clearly erroneous[,]" but "[w]e do not defer to the hearing court's conclusions of law." *Id.* (citing *Bailey v. State*, 412 Md. 349, 362 (2010)). Instead, we "review the hearing judge's legal conclusions *de novo*, making our own independent constitutional evaluation as to whether the officer's encounter with the defendant was lawful." *Id*. at 139–40 (quoting *Sizer*, 456 Md. at 362).

*The Basic Constitutional Framework*

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. CONST. amend. IV. This guarantee applies to the States through the Fourteenth Amendment. *Thornton*, 465 Md. at 140 (citing *Grant v. State*, 449 Md. 1, 16 (2016)). "When evidence is obtained in violation of the Fourth Amendment, it will ordinarily be inadmissible in a state criminal prosecution pursuant to the exclusionary rule." *Id.* (citing *Bailey*, 412 Md. at 363).

Warrantless searches are presumed to be unreasonable, so "[w]hen a police officer conducts a warrantless search or seizure, the State bears the burden of overcoming the presumption of unreasonableness." *Id.* at 141. "There are 'a few specifically established and well-delineated exceptions' to the warrant requirement," including the *Terry* stop and frisk doctrine. *Id.*

The *Terry* frisk, a protective pat-down, is a search on the Fourth Amendment spectrum. *See Pyon v. State*, 222 Md. App. 412, 420 (2015). A *Terry* pat-down is a limited search that must be supported by "reasonable articulable suspicion that the person with

8

whom the officer is dealing is armed and dangerous." *Thornton*, 465 Md. at 142. Whereas the purpose of a *Terry* stop is to investigate possible criminal activity, the purpose of a *Terry* frisk is to protect the searching officer and others in the vicinity. *Ames v. State*, 231 Md. App. 662, 673–74 (2017). Indeed, a *Terry* frisk is limited "to a pat-down of [a person's] outer clothing," and is meant to protect the officer and others, not to discover evidence. *Thornton*, 465 Md. at 142 (quoting *Bailey*, 412 Md. at 368). The *Terry* Court recognized:

> A search for weapons in the absence of probable cause to arrest, however, must, like any other search, be strictly circumscribed by the exigencies which justify its initiation. Thus it must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby, and may realistically be characterized as something less than a "full" search, even though it remains a serious intrusion.

*Terry*, 392 U.S. at 25–26 (citation omitted). Consequently, circumstances establishing reasonable suspicion for an investigatory stop do not automatically establish justification for a pat-down. *See Thornton*, 465 Md. at 142 n.13.

It is the State's burden to overcome the presumption that a warrantless frisk is unreasonable by articulating a "particularized suspicion at its inception." *Id*. at 142. "A law enforcement officer has reasonable articulable suspicion that a person is armed and dangerous where, under the totality of the circumstances, and based on reasonable inferences from particularized facts in light of the law enforcement officer's experience, a reasonably prudent law enforcement officer would have felt that he or she was in danger." *Norman v. State*, 452 Md. 373, 387 (2017).

Although such a belief "must be based on more than an inchoate and

9

unparticularized suspicion or hunch," *Terry*, 392 U.S. at 27, the reasonable suspicion standard "does not require an officer to be absolutely certain that an individual is armed and dangerous[,]" *Thornton*, 465 Md. at 142 (citing *Sellman v. State*, 449 Md. 526, 541 (2016)). The Court of Appeals has "described the standard as a 'common sense, nontechnical conception that considers factual and practical aspects of daily life and how reasonable and prudent people act.'" *Holt v. State*, 435 Md. 443, 460 (2013) (quoting *Crosby v. State*, 408 Md. 490, 507 (2009)).

> [C]onduct that would seem innocent to an average layperson may properly be regarded as suspicious by a trained or experienced officer, but if the officer seeks to justify a Fourth Amendment intrusion based on that conduct, the officer ordinarily must offer some explanation of why he or she regarded the conduct as suspicious; otherwise, there is no ability to review the officer's action.

*Ransome v. State*, 373 Md. 99, 111 (2003). Because it is the State's burden to produce evidence from which a determination of reasonable suspicion may be made, "appellate courts cannot fill in blanks in the evidentiary record." *In re Jeremy P.*, 197 Md. App. 1, 22 (2011).

When evaluating whether an officer had reasonable suspicion for a *Terry* frisk, courts consider the totality of the circumstances. *Holt*, 435 Md. at 460. Although we must "assess the evidence through the prism of an experienced law enforcement officer, and 'give due deference to the training and experience of the . . . officer who engaged the stop at issue,'" *id*. at 461 (alteration in original) (quoting *Crosby*, 408 Md. at 508), we are mindful that ultimately, "[t]he test is objective: 'the validity of the stop or the frisk is not determined by the subjective or articulated reasons of the officer; rather, the validity of the

10

stop or frisk is determined by whether the record discloses articulable objective facts to support the stop or frisk.'" *Sellman*, 449 Md. at 542 (quoting *Ransome*, 373 Md. at 115); *see also Thornton*, 465 Md. at 142–43.

Terry*'s Requirement of Reasonable Articulable Suspicion that the*
*Suspect is Armed and Dangerous*

Before we address the propriety of the *Terry* frisk, we note that Lockard never raised any argument, either at the motions hearing or in his initial brief, concerning Trooper Frye's seizure of the knife from Lockard's pocket as a result of Corporal Adkins's observations. Instead, Lockard maintains that possession of the knife itself did not justify a subsequent frisk for additional weapons.

Thus, to determine the legality of the officers' actions, we must answer the following question: Once the police seized a knife from Lockard, did they have reasonable articulable suspicion that Lockard remained armed and dangerous?[6] The *Terry* Court stated that, for an officer to frisk an individual for weapons,

> The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent [officer] in the circumstances would be warranted in the belief that [the officer's] safety or that of others was in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to [the officer's] inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which [the officer] is entitled to draw from the facts in light of [the officer's] experience.

---

[6] Although it is arguable that Lockard consented to the frisk, and the law permits us to review the issue despite the State's waiver, *see Greenstreet v. State*, 392 Md. 652, 667 (2006) ("[A] party may not concede a point of law to the exclusion of appellate review, as necessary and proper to decide the case."), the motions court expressly found that the State had abandoned any theory that the search was consensual. We conclude that this issue is not before us.

*Terry*, 392 U.S. at 27 (footnote omitted) (citations omitted). This Court has explained that:

> The permitted scope of any search is whatever is necessary to serve the purpose of that search—but not one little bit more. The purpose—the only purpose—of a *Terry* frisk is to discover the presence of suspected offensive weapons that could be used to harm the stopping officer. It is most emphatically not to discover the presence of evidence. The Supreme Court has accordingly scrupulously limited the scope of a *Terry* frisk to a patting down of the exterior of the clothing surface. The reasoning is that such a pat-down is enough to detect the presence of most weapons—guns, knives, black jacks, brass knuckles—and that that is sufficient, therefore, to serve the limited purpose. A frisk is not a permitted procedure to discover the presence of evidence of crime. That requires additional justification.

*Epps v. State*, 193 Md. App. 687, 713–14 (2010). However, the Court of Appeals has clarified:

> *Terry* does not require a police officer to be *certain* that a suspect is armed in order to conduct a frisk for weapons. All that is required is a reasonable suspicion that the person is armed and dangerous. *See New Jersey v. T.L.O.*, 469 U.S. 325, 346 (1985) (noting that "the requirement of reasonable suspicion is not a requirement of absolute certainty: 'sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment. . . .'"); *see generally* 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE, § 9.5(a), at 252 (1996) ("[A] protective search is permissible when there is reason to believe that the suspect *may be* armed and dangerous.").

*In Re David S.*, 367 Md. 523, 541 (2002) (alterations in original).

Our research has not revealed any Maryland case factually analogous to the case at bar. Other courts, however, have considered the propriety of a *Terry* frisk in similar circumstances. In *State v. Baker*, 229 P.3d 650 (Utah 2010), Baker was the backseat passenger in a vehicle that was stopped in the early morning hours because of a broken taillight. *Id.* at 655. In the course of the stop, Officer Raymond Robertson discovered that the driver had a suspended license due to a drug violation. *Id.* The driver was arrested, and the officer called for a K-9 unit to respond. *Id.*

12

Other officers soon arrived on the scene, including Officer Mike Bartell. An unidentified backseat passenger told Officer Bartell he possessed a knife and handed it over. *Id.* at 655–56. Officer Bartell then asked the remaining passengers, including Baker, if they had any more knives. *Id.* The passengers then handed over approximately twelve other knives, including pocket knives and a set of throwing knives. *Id*. at 656. Officer Bartell confiscated the knives and allowed the passengers to remain inside the car pending the arrival of the K-9 unit. *Id.*

Approximately twelve minutes later, after the driver had already been placed under arrest and removed to an officer's patrol car, the K-9 unit arrived on the scene. *Id.* While Baker and the three other passengers remained inside the car, the dog alerted to the presence of drugs within the vehicle. *Id.* Baker and the other passengers were then removed from the vehicle and frisked. *Id.* A marijuana pipe was discovered on Baker's person at the scene. *Id*. When Baker was later booked, the police discovered a small bag of methamphetamine on his person. *Id*. At the suppression hearing, Officer Bartell testified that the passengers were cooperative and "they did nothing to make him fear for his safety." *Id*. Officer Robertson agreed that "in this particular case the reason [he] decided to search Mr. Baker was not because [he] was afraid for [his] safety." *Id.* (alterations in original).

The Utah Supreme Court first evaluated the significance of the positive alert by the drug dog. The court held that the positive alert by the canine did not provide the officers an objectively reasonable belief that Baker was armed and dangerous so as to justify the frisk. *Id*. at 664. Additionally, the court refused to consider whether the officers had

13

probable cause to justify a warrantless search for illegal drugs as a result of the drug sniff because the State failed to argue that theory in either the trial court or on appeal. *Id.*

The court then proceeded to consider the other circumstances surrounding the frisk. In concluding that there was no objectively reasonable belief that Baker was armed and dangerous at the time he was frisked for weapons, the court rejected the State's argument that Baker could have been in possession of additional weapons, holding "that when an individual voluntarily relinquishes a knife, particularly when it is just a small pocket knife, the knife alone does not give an officer automatic justification to conduct a protective frisk. Rather, we evaluate the officer's reasonable articulable suspicion under the totality of the circumstances." *Id.* at 665. The court stated,

> We note that in this case Mr. Baker's cooperation, the officers' subjective lack of fear for their safety, and lack of suspicion that Mr. Baker was involved in a crime associated with violence mitigates the presence of the thirteen knives. As a result, we cannot conclude that the presence of the knives automatically justified a pat-down search of Mr. Baker. Taking all the facts together, we agree with the court of appeals in that the police officers in this case did not have an objectively reasonable belief that Mr. Baker was armed and dangerous sufficient to justify a frisk for weapons.

*Id.*

Finally, the court rejected the State's argument that the intermediate appellate court placed "undue weight" on the officers' lack of subjective fear, stating that "[w]hen the facts that support reasonable suspicion are as tenuous as they are in this case, the fact that the officers did not actually fear for their safety can weigh heavily on the ultimate determination that there was no objective reason to believe that Mr. Baker posed a threat to their safety." *Id.* at 666.

14

Other state courts have reached similar conclusions. *See McGuire v. State*, 425 P.3d 203, 207–08 (Alaska Ct. App. 2018) (although upholding the search and seizure on different grounds, the court concluded that a continued frisk after the officer confiscated a knife that defendant voluntarily disclosed was on his person, was unreasonable under the circumstances); *Debord v. State*, 622 S.E.2d 460, 462 (Ga. Ct. App. 2005) (after removing pocketknife clipped to defendant's pants, officer did not have reasonable articulable suspicion to conduct further search where defendant was "neither aggressive nor threatening," complied with officer's instructions, and there was no evidence to correlate pocketknife with criminal activity).

We also find instructive the Second Circuit Court of Appeals's decision in *United States v. Hussain*, 835 F.3d 307 (2d Cir. 2016). There, the police stopped a car driven by defendant Cunningham for illegally running a stop sign. *Id.* at 310. Officer McAloon approached the car and saw Cunningham with a cellphone "in his [right] hand up to the side of his head." *Id.* Officer McAloon asked Cunningham to put the cell phone down and produce his license and registration. *Id.* Cunningham did not immediately comply. *Id.* After the officer again requested his license and registration, Cunningham "started fumbling around the center console and then . . . reached for the glove compartment." *Id.* Officer McAloon, fearing for his safety, ordered Cunningham out of the car, and Cunningham complied. *Id.* When Officer McAloon asked him if he had any weapons, Cunningham responded that he had a knife in his pocket. Officer McAloon then frisked Cunningham and recovered a legal pocket knife. *Id.* at 311. Officer McAloon advised Cunningham to walk to the back of the car where another officer, Officer Maudsley, was

15

located.  Officer McAloon testified that he felt no need to handcuff Cunningham at that time because Cunningham was "being compliant" and "indicated he had a weapon." *Id.*

The other officer, Officer Maudsley, testified that he initially saw Cunningham "move his right arm in the center console area and pick up a smartphone." *Id.*  He further testified that Cunningham's companion in the car, Scott, was sitting in an "unnatural" position, which suggested to the officer that Scott was trying to obstruct the officers' view of the vehicle's interior.  Upon Officer Maudsley hearing Officer McAloon say "knife," he instructed Scott to get out of the car. *Id.*  Both Cunningham and Scott were controlled by Officer Maudsley at the back of the car as Officer McAloon searched the car. *Id.*  As a result of the search, Officer McAloon found a loaded gun underneath the front passenger seat where Scott had been sitting. *Id.*

Cunningham moved to suppress the gun located in the passenger compartment of the car.  Resolution of the propriety of the vehicle search required the court to apply *Michigan v. Long*, 463 U.S. 1032, 1049 (1983).  There, the Supreme Court held that

> the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

As in *Terry*, *Long*'s requirement of present dangerousness is based on the premise that the search must be protective.

The Second Circuit held that the specific facts articulated by the two officers failed to demonstrate an objectively reasonable fear of immediate danger sufficient to justify a

16

protective search of Cunningham's car. 835 F.3d at 314–15. The court addressed each of the four factors relied upon by the district court in denying the motion to suppress. First, although Cunningham was moving his right arm in the console area, Officer Maudsley testified that Cunningham "had what appeared to be a smartphone in his right hand." *Id.* at 315. Thus, the police were aware that Cunningham "had a smartphone, not a weapon, in his hand when the officer approached the car." *Id.* Second, although the district court did not explicitly rely on Cunningham's failure to immediately comply with Officer McAloon's directions, the Second Circuit nevertheless noted that "the officers did not point to any other specific facts suggesting that Cunningham's failure immediately to comply with Officer McAloon's commands justified a reasonable suspicion that he or Scott was dangerous." *Id.* at 316 (emphasis in original). Third, the court rejected any claim that Scott's "unnatural" position in the passenger seat bolstered the car search, stating that "Scott's position by itself sheds insufficient light on whether he was hiding something dangerous." *Id.* Finally—and most significant to our analysis in the instant case—the court rejected "the presence of a legal folding pocketknife as evidence to support the officer's reasonable suspicion that Cunningham, at least, was dangerous." *Id.* The court recognized that Cunningham volunteered that he had a knife in his pocket and further noted that "Cunningham was fully compliant when he was asked to get out of the car." *Id.* at 317. The court concluded: "On this record we are simply not convinced that the circumstances prior to the search of the [car] supported a <u>reasonable</u> suspicion on Officer McAloon's part that Cunningham and Scott were dangerous and that the car contained a weapon." *Id.* (emphasis in original).

17

We find these cases informative and shall apply their principles to the case at bar.[7]

### *The* Terry *Frisk Here Was Not Supported by Particularized Facts That Lockard Was Armed and Dangerous*

The suppression court found that Lockard's possession of the knife sufficiently established reasonable articulable suspicion to support a *Terry* frisk. But the suppression court did not consider other uncontroverted facts that we view as central to the *Terry* analysis in this case. First, Corporal Adkins testified that he had conducted thousands of frisks and specifically stated that "I know what I can and can't do on a frisk." Corporal Adkins's extensive knowledge and experience provides context to his testimony that he asked Lockard "if he minded if [Corporal Adkins] did a pat-down" for weapons. Specifically, the following was elicited on cross-examination:

> [DEFENSE COUNSEL]:      You indicated you believed you needed to conduct a frisk for weapons for Mr.

---

[7] Although not cited by the State, we recognize the existence of contrary authority. *See O'Hara v. State*, 27 S.W.3d 548, 554 (Tex. Crim. App. 2000) (holding that even after defendant's "belt knife" was removed, pat-down was justified prior to entering patrol vehicle "since other weapons could be in [defendant's] possession but hidden from view").

Additionally, we reject the State's reliance on *Michigan v. Long*, 463 U.S. 1032 (1983), because we find it distinguishable. There, police officers on late night patrol investigated a vehicle that, after driving erratically and at excessive speeds, veered off the road into a ditch. *Id.* at 1035. The driver was already out of the car when the officers arrived. *Id.* at 1035–36. The driver had difficulty following the officers' directions and appeared to be "under the influence of something." *Id.* at 1036. As the driver turned to walk back to his car, presumably to retrieve his registration, the officers saw a large hunting knife on the floorboard of the driver's side of the car. *Id.* The officers confiscated the knife and then searched the driver and the vehicle. *Id.* In upholding the "*Terry*-type search of the passenger compartment" of the vehicle, the Supreme Court specifically considered the lateness of the hour, the erratic driving, the driver's apparent intoxication and failure to cooperate, and the driver's movement to reenter the vehicle where the knife had been observed. *Id.* at 1050. Except for the lateness of the hour, none of the other circumstances relied on in *Long* are present in the instant case.

18

Lockard once he was outside of the vehicle, correct?

[CORPORAL ADKINS]:    I didn't say I needed to. I asked him if I could. I didn't, you know, I didn't need to. If I needed to, if I had to, I would have. *If I had reasonable, articulable suspicion, I would have just searched or frisked him.*

(Emphasis added). Thus, it is clear from the emphasized language that, immediately prior to the frisk, Corporal Adkins did not subjectively believe he had reasonable articulable suspicion to conduct a protective frisk of Lockard.

Although the test is whether the officer objectively had a reasonable belief that the suspect was armed and dangerous, courts have considered the officer's subjective lack of fear for her or his safety as part of a *Terry* analysis. We previously noted that the Utah Supreme Court in *Baker* considered the officers' "subjective lack of fear for their safety" as part of its review of the totality of the circumstances. *Baker*, 229 P.3d at 665-66; *see also United States v. Prim*, 698 F.2d 972, 977 (9th Cir. 1983) (pat-down not justified where officers "testified that nothing about defendant's behavior indicated that he was armed or dangerous"); *State v. Warren*, 78 P.3d 590, 596–97 (Utah 2003) (holding that, although the reasonableness of a *Terry* frisk must be evaluated objectively, officer's subjective belief whether suspect is armed and dangerous is relevant under the totality of the circumstances); *State v. Kyles*, 675 N.W.2d 449, 452 (Wis. 2004) ("A court may . . . consider an officer's belief that his or her safety or that of others was or was not in danger in determining whether the objective standard of reasonable suspicion was met."); *cf. DiPasquale v. State*, 43 Md. App. 574, 578 (1979) (in evaluating a plain view search, we stated that "[t]he subjective

19

belief in the officer's mind is critical, for the entire thrust of the Fourth Amendment and its exclusionary rule is aimed at the reasonableness of police conduct.").

In *United States v. Lott*, 870 F.2d 778 (1st Cir. 1989), the First Circuit Court of Appeals evaluated a protective search of an automobile pursuant to *Michigan v. Long* where the officers did not have a subjective fear for their safety. The court stated,

> Although *Terry* and *Long* speak in terms of an objective test ("reasonableness") for determining the validity of an officer's frisk for weapons, we do not read those cases as permitting a frisk where, although the circumstances might pass an objective test, the officers in the field were not *actually* concerned for their safety. Indeed, this point seems to be implicit in the Supreme Court's reasoning. An officer cannot have a *reasonable* suspicion that a person is armed and dangerous when he in fact has *no* such suspicion.

*Lott*, 870 F.2d at 783–84.

Although we decline to adopt the *Lott* court's holding that "[a]n officer cannot have a *reasonable* suspicion that a person is armed and dangerous when he in fact has *no* such suspicion[,]" *id*. at 784, we nevertheless hold that an officer's subjective belief whether the suspect is armed and dangerous is a relevant consideration in the "totality of circumstances" calculus. Here, Corporal Adkins never expressed any concern that Lockard was armed and dangerous and, as previously noted, he apparently did not subjectively believe that he possessed reasonable articulable suspicion to conduct a *Terry* frisk. Indeed, except for the knife that was confiscated, there was no other indicia that Lockard was armed and dangerous.

In addition to the fact that Corporal Adkins did not subjectively believe Lockard was armed, the other relevant circumstances fail to support the *Terry* frisk. The knife in

20

Lockard's pocket had already been secured by Trooper Frye when Corporal Adkins asked Lockard "if he minded" being frisked. The record further indicates that there were four police officers on the scene to control two individuals: Ms. Clark and Lockard. *See Sellman*, 449 Md. at 546 ("We can deduce from the record that the scene where the traffic stop took place was one in which the officers were in control, and did not fear for their safety."). Finally, Corporal Adkins testified that Lockard was not threatening or aggressive during the encounter, and Deputy Story confirmed that Lockard was "polite and cooperative."[8] Although Corporal Adkins stated that "[i]f there's one weapon, there could be more," that bald assertion, in our view, failed to establish reasonable suspicion sufficient to support a *Terry* frisk.

We are mindful of the Court of Appeals's admonition in *Ransome* that "if the officer seeks to justify a Fourth Amendment intrusion based on [a suspect's] conduct, the officer ordinarily must offer some explanation of why he or she regarded the conduct as suspicious[.]" *Ransome*, 373 Md. at 111. Based on the totality of the circumstances here, even viewed in a light most favorable to the State, we cannot conclude that a reasonably prudent officer such as Corporal Adkins would have had an objectively reasonable belief that Lockard was armed and dangerous sufficient to justify frisking Lockard immediately after asking Lockard "if he minded" being frisked. In short, the record is devoid of particularized facts suggesting that "a reasonably prudent law enforcement officer would

---

[8] We are unpersuaded by the State's assertion that Ms. Clark's apparent drug use and false statement to the police constituted a circumstance that supported the officers' suspicion that Lockard was armed and dangerous.

21

have felt that he or she was in danger." *Norman*, 452 Md. at 387.  The State therefore failed to satisfy its burden to rebut the "presumption of unreasonableness" of this warrantless search.  *Thornton*, 465 Md. at 141.

**JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY REVERSED. CASE REMANDED FOR A NEW TRIAL. COSTS TO BE PAID BY FREDERICK COUNTY.**