# District of Columbia
# Court of Appeals

**No. 13-CM-951**

DEVON SHARP,

Appellant,



FILED

FEB 18 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

v.

**CMD-21631-12**

UNITED STATES,

Appellee.

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE: Blackburne-Rigsby and Beckwith, Associate Judges; and Farrell, Senior Judge.

## JUDGMENT

This case was submitted to the court on the transcript of record, the briefs filed, and without presentation of oral argument. On consideration whereof, and for the reasons set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that appellant's convictions are reversed, as unconstitutional intrusion led to the recovery of a prohibited weapon and the subsequent search of appellant's person and his car incident to arrest. The case is remanded for a new trial at which the fruits of the impermissible seizure are suppressed.

For the Court:

*Julio A. Castillo*

JULIO A. CASTILLO
Clerk of the Court

Dated: February 18, 2016.

Opinion by Associate Judge Corinne Beckwith.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CM-951

DEVON SHARP, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CMD-21632-12)

(Hon. Michael Ryan, Trial Judge)

(Submitted November 14, 2014            Decided February 18, 2016)

*Tito V.A. Castro* for appellant.

*Sharon A. Sprague*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman* and *Christopher Bruckman,* Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY and BECKWITH, *Associate Judges*, and FARRELL, *Senior Judge*.

BECKWITH, *Associate Judge*: Following a stipulated trial, appellant Devon Sharp was found guilty of possession of marijuana,[1] cocaine,[2] and drug

---

[1] D.C. Code § 48-904.01 (d) (2012 Repl.).

paraphernalia[3] and attempted possession of a prohibited weapon.[4]  On appeal, Mr. Sharp challenges the trial court's ruling that the encounter that preceded Mr. Sharp's admission to the police officer that he was carrying brass knuckles was a consensual one, rather than a seizure that triggered Fourth Amendment protections and required suppression of the evidence stemming from the seizure.  We conclude that Mr. Sharp was seized for Fourth Amendment purposes when he was stepped out of his car and that his seizure was not justified by the "specific and articulable facts" required under *Terry v. Ohio*, 392 U.S. 1, 21 (1968).  We therefore reverse Mr. Sharp's convictions and remand for a new trial at which the evidence uncovered as a result of that seizure is suppressed.

## I.

The two witnesses who testified at the suppression hearing—Metropolitan Police Department Officer John Pugh and appellant Devon Sharp himself—gave divergent accounts of the incident leading to Mr. Sharp's arrest.  Officer Pugh testified that he and Officers Christopher Dorsey and Brett Cuevas were patrolling

---

(continued…)

[2]  D.C. Code § 48-904.01 (d) (2012 Repl.).

[3]  D.C. Code § 48-1103 (a) (2012 Repl.).

[4]  D.C. Code §§ 22-4514 (a), -1803 (2012 Repl.).

the area near 14th and U Streets, Northwest, shortly after midnight when their police vehicle broke down. As the officers pushed the vehicle into a parking space, Officer Pugh heard a "loud scream or commotion" coming from a parking lot across the street where the officer said valets often park cars and where "a lot of cars get broken into." It "wasn't like a someone[-]in[-]danger scream" but "just a noise that caught [his] attention."

When the people causing the commotion walked away, Officer Pugh's attention was drawn to some rap music coming from a parked Jeep whose driver, appellant Devon Sharp, was "sitting behind the wheel" with "his head down" and was "looking down at something in his hands." Officer Pugh "went . . . to check the person, but really to find out if he was the valet or not." Wearing black tactical police vests and badges and identifying themselves as police officers, Officer Pugh approached the driver's side of the vehicle and Officer Dorsey approached on the passenger side. Officer Pugh asked Mr. Sharp what he was doing there, a question that prompted a series of what Officer Pugh described as nervous behaviors and nonresponsive answers from Mr. Sharp. "Didn't know if he had any[thing] illegal on him, anything illegal in the vehicle," Officer Pugh said, "so I asked him could I search his vehicle." Officer Pugh testified that after Mr. Sharp declined a vehicle search, "[d]ue to him seeming kind of nervous, and making me kind of feel slightly uncomfortable, I asked could he step out of the vehicle." Officer Pugh said he did

not "command" Mr. Sharp to step out of the vehicle—"I asked him can he step out of the vehicle"—and that Mr. Sharp "complied freely" and "stepped out calmly and stepped out regularly."[5]  Officer Dorsey came around to the driver's side of the car and stood next to Officer Pugh as Mr. Sharp was getting out of the car.

Officer Pugh testified that he asked Mr. Sharp whether he had any weapons on him, and Mr. Sharp "said yes and began reaching his hand into his left front jacket pocket," telling the officer that he had brass knuckles.  Officer Pugh recovered the brass knuckles and placed Mr. Sharp in handcuffs, after which Officer Dorsey searched Mr. Sharp further, incident to the arrest, and recovered "multiple zips containing a white powdery substance."  Officer Pugh testified that the officers then searched Mr. Sharp's vehicle, where they recovered, from a baby seat in the back, a bag containing a green weed-like substance that field tested positive for marijuana.

For his part, Mr. Sharp testified that he worked security for and managed several restaurants and bars in the U Street area and that he had been parking his car in the lot at 14th and U Streets "for a long time."  Mr. Sharp said that on the day of the incident he was sitting in his vehicle and may have been texting on his

_____

[5]  Officer Pugh also denied that he grabbed Mr. Sharp's arm and helped him out of the car.  Instead, he said, Mr. Sharp got out of the car "[o]f his own free will."

phone as he "was getting ready to get out of the car" when Officer Pugh "stopped [him]," told him "to hold on," and "hindered [him] from getting out of the vehicle." According to Mr. Sharp, Officer Pugh asked him whether he had any weapons while Mr. Sharp was still inside the Jeep, Mr. Sharp answered no, but Officer Pugh "told [him] he was going to search [him] for his safety," opened the door, and "asked [him] to get out of the car." Mr. Sharp testified that he felt he had no choice but to get out of the car, that "it was more guided than anything," and that because he was parked near some pillars, the officer "kind of had me boxed in so there wasn't really too much I can do." According to Mr. Sharp, Officer Pugh held his arm as he got out of the Jeep, patted him down, and found the brass knuckles. Mr. Sharp testified that he was "100 percent sure" that he never told Officer Pugh about the brass knuckles until the officer felt them and asked what they were, to which Mr. Sharp responded "brass knuckles."

The government argued that Mr. Sharp voluntarily stepped out of his car after being asked to do so, but that even if he were seized for Fourth Amendment purposes, the police had reasonable suspicion to justify such a seizure based upon the lateness of the hour, the danger inherent in approaching a person seated in an automobile, the officer's familiarity with criminal activity in that particular parking lot, Mr. Sharp's nervous behavior and nonresponsive answers to the officer's questions, and the fact that Mr. Sharp was doing something with his hands that the

approaching officers could not see.

In its ruling on Mr. Sharp's motion to suppress, the trial court described the case as "essentially boil[ing] down to the credibility determination between Officer Pugh and Mr. Sharp," and noted that it was "having a hard time crediting Mr. Sharp's testimony." Closely tracking Officer Pugh's testimony, and explicitly discrediting Mr. Sharp's, the court found that Officer Pugh "approached the side of the car and asked [Mr. Sharp] to step out of the car, and he stepped out at the request of, but not at the order of[,] the police officer." The court further found that "Pugh asked him if he had any weapons and he said yes, and reached in, and Pugh asked him what it was and he said brass knuckles." The court noted that if Officer Pugh had seized Mr. Sharp for Fourth Amendment purposes, the justification for doing so under *Terry* would be questionable—"as thin as it could be" and "a very close call." But having concluded that Officer Pugh "asked not ordered Mr. Sharp out of the car," the trial court deemed the encounter to be a consensual one, not a seizure that triggered Fourth Amendment protections. After denying Mr. Sharp's motion to suppress the evidence seized from him and his vehicle, the trial court found Mr. Sharp guilty of all counts against him after a stipulated trial.

**II.**

On appeal, Mr. Sharp argues that the trial court erred in denying his suppression motion because, among other things, he was unreasonably seized in violation of the Fourth Amendment when the police stepped him out of his vehicle without probable cause or reasonable suspicion. The government argues primarily that Mr. Sharp cannot rely upon testimony the trial court discredited to support his contention that he was subject to an unreasonable seizure. We agree with the government in that regard, but conclude that when Officer Pugh "asked [Mr. Sharp] can he step out of the vehicle" after Mr. Sharp had already declined the request to search his car, Officer Pugh made a show of authority that amounted to a seizure, and the officers did not have reasonable articulable suspicion to justify the detention.

The Fourth Amendment of the Constitution protects people from unreasonable seizures by government authorities. *Terry*, 392 U.S. at 9. In reviewing a trial court's denial of a motion to suppress evidence on Fourth Amendment grounds, we defer to the trial court's findings of evidentiary fact unless clearly erroneous, and we view those facts, and the reasonable inferences that stem from them, in the light most favorable to the government. *Henson v. United States*, 55 A.3d 859, 863 (D.C. 2012). We review de novo the trial court's

conclusions of law. *In re J.M.*, 619 A.2d 497, 500 (D.C. 1992) (en banc). Whether Mr. Sharp was seized is a question of law, *In re J.F.*, 19 A.3d 304, 308 (D.C. 2011), as is the ultimate question whether the police had reasonable suspicion for such a seizure, *Umanzor v. United States*, 803 A.2d 983, 991 (D.C. 2002) (describing the question as a "mixed question of law and fact" in which we "defer to the trial court's factual findings unless clearly erroneous, and make an independent legal assessment as to whether there was reasonable suspicion for the stop").

Encounters between citizens and law enforcement officers fall into three general categories: consensual encounters, investigative detentions, and full-fledged arrests. *Gordon v. United States*, 120 A.3d 73, 78 (D.C. 2015). "Both investigative detentions and arrests are seizures under the Fourth Amendment," while consensual encounters, during which a person may comply with or choose to ignore a police officer's requests, are not. *Id.* While an arrest, to be lawful, must be supported by probable cause to believe that a crime has been or is being committed, a police officer may perform an investigative detention based on less than probable cause if, given the totality of the circumstances, the officer could "reasonably . . . conclude in light of his experience that criminal activity may be afoot." *Terry*, 392 U.S. at 30.

We turn first to the question whether Mr. Sharp was seized when Officer Pugh got him out of the vehicle. In determining "whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439 (1991). Although this court "defers to the trial court's findings of fact unless they are clearly erroneous," *Limpuangthip v. United States*, 932 A.2d 1137, 1141 (D.C. 2007), we do not regard the trial court's determination that this encounter was consensual as a factual finding that Mr. Sharp voluntarily complied with Officer Pugh's request, but rather as a legal conclusion subject to de novo review. *See Jackson v. United States*, 805 A.2d 979, 985–86 (D.C. 2002) (reviewing de novo the trial court's determination that appellant voluntarily consented to an officer's request to lift his jacket and turn around); *see also Turner v. United States*, 116 A.3d 894, 915 (D.C. 2015) (deferring to the trial court's factual determinations but declining to "accord comparable deference to[] the judge's determination of the ultimate question of *Brady* materiality"); *Miller v. United States*, 14 A.3d 1094, 1122 (D.C. 2011) ("Because the trial judge's ruling that there was no suppression (i.e., that the defense was not prejudiced as a result of the prosecutor's delayed disclosure) necessarily decides the ultimate question of *Brady* materiality, we are

not required to accord appellate deference to such a determination.").

At the outset, the government notes the absence of any finding that Officer Pugh touched or threatened Mr. Sharp or drew a gun, and relies on *Kelly v. United States*, 580 A.2d 1282 (D.C. 1990) (officer's questioning of the defendant in a train station was a consensual encounter), and *United States v. Barnes*, 496 A.2d 1040 (D.C. 1985) (defendant was not "seized" when an officer approached him outside a store, asked him questions about what he was doing, and asked him to remove his hands from his pockets). But the circumstances of *Kelly* and *Barnes* lack an element of coercion that is present here. *See Hawkins v. United States*, 663 A.2d 1221, 1230 (D.C. 1995) (Farrell, J., concurring) (noting that police conduct "crossed the critical line between consent and coercion"). *Kelly* is a pure questioning case. *See Kelly*, 580 A.2d at 1286; *see also Immigration & Naturalization Serv. v. Delgado*, 466 U.S. 210, 216 (1984) (stating that "police questioning, by itself, is unlikely to result in a Fourth Amendment violation"). And the court in *Barnes* noted, in concluding that nothing "would have warranted appellee's reasonable belief that he was not free to ignore the questions and walk away," that the officer's request that Mr. Barnes remove his hands from his pockets "was no more intrusive than a request for identification"—something officers can do without initiating a Fourth Amendment seizure. 496 A.2d at 1045. *But cf. In re J.F.*, 19 A.3d at 309 (finding a Fourth Amendment seizure based in

part upon an order that J.F. remove his hands from his pockets).

By contrast, the Supreme Court has acknowledged that people have a "sense of security and privacy in traveling in an automobile" that they do not have traveling as pedestrians or other ways of getting around. *Brendlin v. California*, 551 U.S. 249, 262 (2007) (quoting *Delaware v. Prouse*, 440 U.S. 648, 662 (1979)). While Officer Pugh described his request to search Mr. Sharp's vehicle as "ask[ing] him for consent," he did not describe his request that Mr. Sharp get out of the car in those terms, and it would be curious to do so. Courts routinely treat a request to step out of a car as interchangeable with an order or direction to get out of a car—a fact that strongly suggests that a reasonable person would likewise believe that an officer who asked him to get out of a car was not giving him a realistic right to say no. *See, e.g.*, *Pennsylvania v. Mimms*, 434 U.S. 106, 107, 108, 111 (1977) (describing the seizure at issue both in terms of the officer having "asked respondent to step out of the car" and having "order[ed]" him out of the car); *Gomez v. United States*, 597 A.2d 884, 886, 888, 891 n.16 (D.C. 1991) (using both the term "asked" and the term "ordered" to describe how police got the cars' occupants out of their vehicles).

This court and courts in other jurisdictions have held in analogous circumstances—that is, in circumstances that do not involve a routine traffic

stop—that the police seized the occupant of a vehicle by asking that individual to step out of the vehicle. In *Gomez*, for example, this court held that the defendant was seized when police approached his car in an alley, asked him to get out of the car, and asked him to place his hands on the vehicle. *Id.* at 888, 891 n.16. As in the present case, the officer in that case testified that he "asked, but did not 'order,' [the defendant] and his companions to get out of the car," but this court concluded that "the officer's characterization of his communication to the occupants as a request [was] not dispositive." *Id.* at 886, 891 n.16. And on facts very similar to those here, the Florida Supreme Court held in *Popple v. State* that "[w]hether characterized as a request or an order," the police officer's "direction for Popple to exit his vehicle constituted a show of authority which restrained Popple's freedom of movement because a reasonable person under the circumstances would believe that he should comply." 626 So. 2d 185, 188 (Fla. 1993).

These holdings align with the wealth of Fourth Amendment decisions that assume that a person who is stepped out of a car has been seized and wrestle instead with the extent to which that seizure was supported by reasonable suspicion.[6] These include *Pennsylvania v. Mimms*, where the Supreme Court

---

[6] Other decisions of this court provide additional examples of Fourth Amendment seizures that, like a request to get out of a car, are created only by "the use of language or tone of voice indicating that compliance with the officer's

(continued…)

established a police officer's authority to have a driver exit his vehicle after the police have performed a lawful traffic stop. 434 U.S. at 111. In *Mimms*, it was undisputed that such a request marked a seizure even where, according to the Supreme Court's recitation of the undisputed facts, the officer "approached and *asked* respondent to step out of the car." *Id.* at 106 (emphasis added); *see also id.* at 111 n.6 (stating that "we do not hold today that 'whenever an officer has an occasion to speak with the driver of a vehicle, he may also order the driver out of the car'"); *People v. Luedemann*, 857 N.E.2d 187, 191–92 (Ill. 2006) (noting that "[t]he State argued that no seizure occurred until Officer Pate asked defendant to step out of the car" and that "even if Officer Pate did seize defendant prior to asking him to step out of the vehicle," that seizure was justified by reasonable suspicion); *Mitchell v. United States*, 746 A.2d 877, 885 (D.C. 2000) (explaining, in a case in which the court found a Fourth Amendment seizure where police

---

(continued…)

request might be compelled," *United States v. Mendenhall*, 446 U.S. 544, 554 (1980), without any physical touching or threatening display of a weapon. In *In re D.T.B.*, for example, this court concluded that an armed, uniformed officer seized an individual when he confronted him in an enclosed space and told him to "come here." 726 A.2d 1233, 1236 (D.C. 1999); *see also Ware v. United States*, 672 A.2d 557, 561 (D.C. 1996) (holding that appellant was seized when an officer "told him in an authoritative manner to get off his bicycle, put the purse down, and keep his hands out in the open"); *United States v. Johnson*, 496 A.2d 592, 594, 595 (D.C. 1985) (concluding that a uniformed police officer's command to "come here, police officer" was a Fourth Amendment seizure).

officers directed the appellant out of his parked car, that "[the fact] [t]hat [appellant] was already 'stopped,' i.e., parked, when the officer came up to him does not alter the nature of the encounter in this case"), *superseded by statute on other grounds*, D.C. Code § 25-101 (35) (2012 Repl.), *as recognized in Workman v. United States*, 96 A.3d 678, 680 n.6 (D.C. 2014); *Jones v. United States*, 391 A.2d 1188, 1190 (D.C. 1978) (holding that an officer "seized" the occupants of a parked car when he ordered them out of that car, and equating these facts with "the request to get out of the car" that was at issue in *Mimms* (quoting *Mimms*, 434 U.S. at 109)). The government has pointed to no case in which a court held that an individual was not seized when police asked him to get out of a vehicle.

A "totality of the circumstances inquiry, by its nature, eschews *per se* rules,"[7] and we do not hold today that a police officer seizes a car's occupant in every instance where he asks him to get out of the vehicle. But in the absence of any sign that a reasonable person in these circumstances would believe the officer was giving him a genuine choice to decline the request and stay in the car, we

---

[7] *In re J.H.*, 928 A.2d 643, 650 (D.C. 2007) (addressing custody under *Miranda v. Arizona*, 384 U.S. 436 (1966)); *see also Gomez*, 597 A.2d at 889 ("Each case turns on its particular facts, and 'case matching' is of limited utility in Fourth Amendment analysis of street encounters between citizens and police officers, for 'two cases are seldom sufficiently alike for the first to be an absolute binding precedent for the second.'" (quoting *Arrington v. United States*, 311 A.2d 838, 840 (D.C. 1973))).

conclude that the police here "convey[ed] a message that compliance with their request[] [was] required," *Bostick*, 501 U.S. at 435, and that Mr. Sharp was at that moment seized for purposes of the Fourth Amendment. As the government puts it, Officer Pugh simply "asked appellant to get out of the car." *See* Appellee Br. 22 n.25. The trial court also found that Officer Pugh "asked [Mr. Sharp] to step out of the car." While theoretically an officer might ask a vehicle's occupant if he would consent to getting out of a car in a way that gave the occupant "a realistic right to decline," *see Gomez*, 597 A.2d at 891 n.16, under the circumstances here, the officer's routine act of asking the driver to get out of the car—a request made after the driver had already turned down the officer's initial request to search the car— "would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 439; *see also, e.g.*, *Jackson*, 805 A.2d at 988 (that the police officer "remained unsatisfied and continued to question [appellant] add[ed] to the circumstances that would convey to a reasonable innocent person that he was not going to be permitted to leave"); *Hawkins*, 663 A.2d at 1226 & n.20, 1228 (repeated police questions despite appellant's denial that he had a weapon constituted Fourth Amendment seizure).

Because Mr. Sharp was seized, the evidence that stemmed from the questioning and the vehicle search that followed his seizure should have been

suppressed unless the officers had reasonable articulable suspicion to justify the seizure. *See Barnes*, 496 A.2d at 1042 (stating that "if the approach and questioning amounted to a seizure—i.e., physical force or a show of authority such that a reasonable person would not believe he was free to leave—that seizure would be unconstitutional, and thus the later, more formal detention and related frisk would be as well" (quoting *Delgado*, 466 U.S. at 215)). An investigatory detention is constitutionally permissible if it is supported by reasonable suspicion, which is "a particularized and objective basis" for suspecting the detained person of criminal activity. *Ornelas v. United States*, 517 U.S. 690, 693, 696 (1996) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). "Various factors are considered in determining whether a *Terry* stop is justified, including 'the time of day, flight, the high crime nature of the location, furtive hand movements, an informant's tip, a person's reaction to questioning, a report of criminal activity or gunshots, and viewing of an object or bulge indicating a weapon.'" *Jackson*, 805 A.2d at 988–89 (quoting *Anderson v. United States*, 658 A.2d 1036, 1038 (D.C. 1995)). These factors "'are not elements of a conjunctive test,' and no one factor is 'outcome determinative.'" *Umanzor*, 803 A.2d at 993 (quoting *In re D.A.D.*, 763 A.2d 1152, 1155 (D.C. 2000)).

On appeal, the government argues only that the police never seized Mr. Sharp and does not contend that even if he were seized, that seizure was justified

by reasonable suspicion. Our holding in this regard conforms with the government's implicit concession. As an initial matter, the circumstances here differ from those in *Mimms*, 434 U.S. at 109, in that, as the trial court observed, "there is no violation of law that's alleged" at the onset of the officers' encounter with Mr. Sharp. As we stated in *Carr v. United States*, "analogizing to *Mimms*" in a case like this—in which the encounter does not begin with a stop for a traffic violation—"focuses solely on the reasonableness of what happened in the encounter without considering why there was an encounter." 758 A.2d 944, 947 (D.C. 2000); *see also id.* (noting that "[t]here is no automatic right for police to order occupants out of a car" and that in *Mimms* "the reasonable articulable suspicion that justifies the initial stop is the traffic violation").

Officer Pugh testified that he was aware of some criminal activity in the parking lot—specifically, "a lot of cars get broken into" and sometimes "some homeless people get in" to a double-wide trailer on the property "and do things to there [sic]." He was drawn to the lot that night by a "loud scream or commotion" from the adjacent street, although it "wasn't like a someone[-]in[-]danger scream," the commotion was unconnected to Mr. Sharp, and the people Officer Pugh associated with the commotion walked away. The music Mr. Sharp was playing drew Officer Pugh to Mr. Sharp's car, which was legally parked. Officer Pugh did not testify that Mr. Sharp's behavior—sitting in the driver's seat looking at

something in his hands—caused suspicion, and Mr. Sharp did not make any furtive movements as the officers approached. The most Officer Pugh could say about Mr. Sharp in particular was that he seemed nervous, that he made some odd nonresponsive comments about police officers he knew, and that he declined the request to search his car before the officer "asked him can he step out of the vehicle." Although the trial court did not decide the question, it had its own doubts about the justification for getting Mr. Sharp out of the car, noting that if Mr. Sharp had been seized, "the inarticulate character" of Officer Pugh's alleged suspicion—Officer Pugh said "[h]e was making me nervous because he was acting nervous"—"probably defeat[ed] the reasonable articulable suspicion."

These circumstances did not give police a particularized basis to suspect "that criminal activity may be afoot." *Singleton v. United States*, 998 A.2d 295, 299 (D.C. 2010) (quoting *Wilson v. United States*, 802 A.2d 367, 369 (D.C. 2002)); *see also Johnson*, 496 A.2d at 594–95 (concluding that "a situation in which persons unfamiliar to the police are parked in a car late at night in a high crime area does not, without more, present specific, articulable facts warranting suspicion of criminal activity" (quoting *Johnson v. United States*, 468 A.2d 1325, 1327 (D.C. 1983))). The totality of the circumstances thus did not provide the requisite justification for the police officer's intrusion.

## III.

Because we conclude that the police seized appellant Devon Sharp without reasonable articulable suspicion, and because that unconstitutional intrusion led to the recovery of the brass knuckles and to the subsequent search of Mr. Sharp's person and his car incident to arrest, we reverse Mr. Sharp's convictions and remand for a new trial at which the fruits of the impermissible seizure are suppressed. *See Carr*, 758 A.2d at 948.

*So ordered.*