*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CO-0589

MARIO MAYE, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-616-13)

(Hon. Patricia A. Broderick, Trial Judge)

(Submitted September 22, 2020            Decided October 7, 2021)

*Monica J. Milton* was on the brief for appellant.

*Timothy J. Shea*, United States Attorney at the time the brief was filed, with whom *Elizabeth Trosman*, *Chrisellen R. Kolb*, *Christine Macey*, and *Mark Hobel*, Assistant United States Attorneys, were on the brief, for appellee.

Before EASTERLY, MCLEESE, and DEAHL, *Associate Judges*.

DEAHL, *Associate Judge*: Mario Maye and a group of about seven friends, a mix of males and females, were gathered outside one evening when a police vehicle pulled up and parked near the group. Two officers, who had not observed any illegal activity and were not responding to any report, exited the vehicle. Officer Sean

Kenney's focus immediately turned to Maye because he was doing something with his waistband and then placed his hand into his pants pocket where a "typical folding pocketknife" was clipped. There are some unresolved questions about what happened next, but ultimately Officer Kenney approached Maye, asked him to take his hand out of his pocket, and then asked if he could search him. Maye agreed and the officer found cocaine in his waistband during the search. Maye moved to suppress the narcotics, arguing he had been illegally seized in violation of his Fourth Amendment rights before purportedly consenting to the search. The court denied the motion, finding Maye had voluntarily consented to the search, but without addressing Maye's contention that his consent was the fruit of an illegal seizure. A jury then found Maye guilty of possession with intent to distribute cocaine.

Maye appealed, maintaining that his Fourth Amendment rights were violated because any consent to the search was the byproduct of an illegal seizure. We did not resolve that question in an earlier appeal, instead remanding the case because we were "unable to ascertain, on th[at] record, what specific testimony the trial court credited." *Maye v. United States*, No. 13-CF-1271, Mem. Op. & J. at 4 (D.C. July 15, 2015). We instructed the trial court, on remand, to make a "clearer determination" about "whether [Maye]'s consent was voluntary, [or] whether it was the product of an illegal seizure." *Id.* On remand, the trial court issued a written

order finding "police officers obtained consent to search [Maye] during a lawful *Terry* stop" because they had reasonable articulable suspicion to seize him. Maye now appeals again, raising the same core Fourth Amendment claim.

We agree with Maye that, if he was seized, that seizure was unlawful and the trial court erred in concluding it was supported by reasonable articulable suspicion. Any consent he offered while unlawfully seized would "not [be] free from the taint of unlawful detention" under these circumstances, and would thus be "insufficient to show consent." *Jones v. United States*, 154 A.3d 591, 598 n.20 (D.C. 2017).

The government nonetheless asks us to affirm on the ground that Maye was not seized, contrary to the trial court's repeated statements that his consent came amidst a lawful *Terry* stop. Unfortunately, we once again find ourselves without findings critical to assessing that question. The trial court focused its findings on whether it was reasonable to seize Maye and whether Maye *voluntarily* consented to a search regardless of whether he was seized. But it never focused on the related and we think dispositive question of whether Maye was seized at the moment of his purported consent. For instance, while the court stressed that Ronald Hall—Maye's friend at the scene—testified to facts that "did not materially contradict the officers' testimony," his testimony did diverge from the officers' in respects critical to

assessing when Maye was seized. Because further factual findings are potentially dispositive as to whether Maye was seized when he agreed to be searched, we remand the case for further findings.

## I.

Maye was arrested and indicted for possession with intent to distribute a controlled substance after officers discovered cocaine in his waistband. He moved to suppress the drugs found on him during a pat-down search preceding his arrest, and the trial court held an evidentiary hearing on that suppression motion.

The government presented testimony from Officers Sean Kenney and Matthew Jones at the suppression hearing. Each testified that on January 10, 2013, at around 7:15 p.m., they were on routine patrol in a marked police vehicle in the District of Columbia's Sixth District. They came to the 800 block of 51st Street SE, which they described as a high-crime area known for guns and narcotics-related offenses. Officer Jones testified that "we've come into contact with multiple individuals in that block with weapons and narcotics," and that just one week prior to testifying, he arrested someone on that same block with four PCP-dipped cigarettes. Officer Kenney more generally described the entire Sixth District—save for a "couple of little streets here and there maybe" and a park "where it might not

be as high as other areas"—as a high-crime area.  On that block they saw a group of about eight people, mostly males with a couple of females, standing near a car parked alongside the curb.  While the group was not "doing anything that appeared to be illegal," the officers—both in full police uniform—pulled up near the group and parked their car to initiate a "citizen encounter."  They did not activate their patrol car's siren or emergency lights.

Officer Kenney's focus immediately turned to Maye because he—while facing Officer Kenney and without "trying to hide" what he was doing—"manipulat[ed] his waistband" with his right hand.  Maye then put that same hand in his right pants pocket.  Officer Kenney approached Maye and noticed what he identified as a "typical folding pocket knife" clipped inside of that same pocket, though he did not "feel threatened" by it or suspect the knife was illegal in any respect.  He described it as "a silver knife with a silver clip," "[l]ike the clip on the back of a pen," though the body of the knife was "in [Maye's] pocket" so it is unclear how much beyond the clip Officer Kenney was able to see.  There was no further description of the knife—Officer Jones had no recollection of a knife, Hall testified that he did not see Maye with a knife, and Maye disclaimed having one.  Officer Kenney did not otherwise "see anything bulge wise" or observe anything "to suggest that [Maye] was breaking the law," and he did not disagree that Maye might "have

been adjusting" the belt he was wearing when manipulating his waistband. Nonetheless, based on the "movements [Maye] was making with his hand," Officer Kenney testified he was "concerned with the fact that there might be a gun in [Maye's] waistband."

Officer Kenney asked Maye if he could "speak to him for a minute," and Maye responded with "something to the effect of, sure, what's up?" Officer Kenney then said, "while I'm speaking with you, would you mind taking your hand out of your pocket," and Maye complied. He next asked: "[W]hile I'm speaking with you, do you mind if I pat you down for officer safety for any weapons?", and Maye replied, "sure, that's fine." Maye then placed his hands on the trunk of the nearby car, and Officer Kenney "immediately went to the area of his waistband" as he started the pat-down search. Officer Kenney "felt a bulge" that he "immediately recognized to be narcotics." He then reached into Maye's waistband and removed a "clear plastic bag that contained 55 smaller [bags], each of which contained a rock-like substance" later confirmed to be cocaine. Officer Kenney could not recall if he removed the pocketknife during the pat-down, noting only that he "didn't seize it as evidence or anything like that," but that it was certainly removed at some point and perhaps given to one of Maye's friends at the scene.

Maye and Hall testified to a very different version of the encounter. Maye testified that the officers "pulled up," "got out of the[ir] car," asked if anyone in the group had weapons, instructed "everybody [to] put [their] hands on the car," and then "immediately" handcuffed him before he was searched. He went into more detail, but the trial court generally did not credit Maye—and specifically discredited his claim, echoed by Hall, that he was handcuffed before being searched—so we turn to Hall's account, which the court found more credible.

Hall testified that he was hanging out with a group of about seven friends when two officers "rode up," "proceeded to get out of [their patrol] car," and asked "who lives here?" Officer Kenney went immediately to Maye and grabbed him, while at about the same time Officer Jones directed the rest of the group to put their hands on the car. Hall at times described this as a command and at times as a request, once recounting Officer Jones saying to the group, "we going to need you to put your hands on the car," and later phrasing it as, "can you get up and put your hands on the car?" Hall was then questioned by Officer Jones, but he was still able to hear and see Maye's interactions with Officer Kenney. He was unsure if Officer Kenney ever asked Maye for permission to conduct a search.

At the conclusion of the hearing, the trial court orally denied Maye's suppression motion. The entirety of that initial ruling is as follows:

> Listening to all the testimony, I do find that I credit Officer Kenney. I'm not overly impressed with Officer Jones. Mr. Hall was credible, too, but inconsistent, really, in the details that he was able to provide, but he didn't provide a lot of details.
>
> I find that Officer Kenney and Officer Jones were more consistent with each other than Mr. Hall and Mr. Maye. For that reason, I do give more credit to Officer Kenney and I do find that there was consent in this case. So I'll deny the motion.

The case then proceeded to trial and a jury found Maye guilty of possession with intent to distribute cocaine.

Maye appealed, reasserting his Fourth Amendment claim and contending that the trial court erred in a variety of ways when denying his suppression motion. We did not resolve most of his legal arguments in that initial appeal because we determined that the trial court's findings were insufficient to permit meaningful appellate review. *Maye*, Mem. Op. & J. at 3-4. We noted that the trial court "made no findings on critical issues such as the voluntariness of [Maye's] consent, the point at which he was seized, whether that seizure was lawful, when consent was given in relation to his seizure, and whether seizing the package of drugs from inside [Maye's] pants exceeded the scope of the consent." *Id.* at 4. We also explained that

it was not possible to ascertain "what specific testimony the trial court credited in deciding 'there was consent in this case'" because the trial court found both Officer Kenney and Hall credible, and their testimonies "greatly differed." *Id.*

On remand, the trial court issued a written order once again denying Maye's suppression motion. It articulated two bases—which it treated as independent bases—for its ruling. It first found the officers had reasonable articulable suspicion as necessary to seize Maye and conduct a pat-down search of his waistband under *Terry v. Ohio*, 392 U.S. 1 (1968), rendering his consent, or lack thereof, immaterial. The court relied on the following findings as support for that conclusion: (i) "seven or eight individuals [were] standing within [a] 'high crime area' surrounding a parked car," (ii) Maye made "furtive gestures" near his waistband and pants pocket, and (iii) Officer Kenney observed a pocketknife clipped to Maye's pants pocket, which the trial court thought "carr[ied] with it an indici[um] of wrongdoing." The trial court also concluded that the pocketknife gave officers specific reason to believe Maye was armed and dangerous.

The court further found, ostensibly in the alternative, that Maye voluntarily consented to the pat-down because he "responded affirmatively" to a "simple, straightforward question," and the "undisputed" facts showed that Officer Kenney

"did not engage in any behavior that could be construed as over-bearing or coercive." It noted that although the officers were in "police uniform," they "did not have the emergency equipment activated," "walked casually toward the group . . . without weapons drawn, and asked conversationally what was going on." The court did not make a finding as to whether the officers directed everyone in the group to place their hands on a nearby car, as Hall had testified, though it stressed that Hall's testimony "mostly . . . did not materially contradict the officers' testimony." Finally, the trial court determined that the search of Maye exceeded neither the scope of a valid *Terry* search nor the scope of his consent. It thus again denied Maye's motion to suppress.

## II.

Maye now argues (1) there was not reasonable articulable suspicion sufficient to justify his seizure and pat-down search of his waistband, and (2) his purported consent to the pat-down was tainted by his illegal seizure. We agree with Maye on the first point and, if he was in fact seized, we would agree with him on the second as well. As to the first point, there is nothing suspicious about gathering with a small group of friends outside at around 7:15 in the evening, and Maye's hand movements as recounted by Officer Kenney were innocuous. Having a "typical folding

pocketknife" clipped inside of his pants pocket does not add much to the equation. Officer Kenney had no suspicion of the knife's illegality, and the presence of a legal pocketknife did not give rise to a reasonable suspicion that Maye was engaged in criminal activity in these circumstances.

Whether Maye was seized before agreeing to a search, which the government disputes, is a harder question that we again cannot answer on the record before us. There are discrepancies in the testimony that the trial court did not resolve— including that we cannot tell if the trial court credited Hall's account that the officers directed the entire group of friends to put their hands on the car and that everybody complied. Whether that is true is a potentially dispositive factor in determining whether Maye was seized, i.e., whether a reasonable person in his shoes would have felt "free to . . . terminate the encounter" with the officers and go about his way. *Sharp v. United States*, 132 A.3d 161, 166 (D.C. 2016) (quoting *Florida v. Bostick*, 501 U.S. 429, 439 (1991)). We thus remand for further factual determinations relevant to whether Maye was in fact seized when he agreed to a search. If he was, that seizure was in violation of the Fourth Amendment, thus obviating any purported consent, and the court should vacate Maye's conviction.

**A.**

We begin with the trial court's ruling that the officers had the reasonable articulable suspicion required for an investigatory seizure and a protective pat-down search of Maye. Consistent with the Fourth Amendment's protections "against unreasonable searches and seizures," it is settled that a police officer "may conduct a brief stop (a seizure) 'for investigatory purposes' when he has 'reasonable suspicion supported by specific and articulable facts that the individual is involved in criminal activity.'" *Pridgen v. United States*, 134 A.3d 297, 301 (D.C. 2016) (quoting *Robinson v. United States*, 76 A.3d 329, 335-36 (D.C. 2013)). "And if, in the course of that stop, the officer" further "has reasonable, articulable suspicion that the person detained is armed and dangerous, [the] officer may also conduct a protective frisk for weapons." *Robinson*, 76 A.3d at 336 (quoting *Henson v. United States*, 55 A.3d 859, 867 (D.C. 2012)) (quotation marks omitted). This type of brief seizure and pat-down is sometimes referred to as a *Terry* stop and frisk. *See Terry v. Ohio*, 392 U.S. 1 (1968).

The reasonable articulable suspicion standard is neither onerous nor toothless. *Robinson*, 76 A.3d at 336. It requires "at least a minimal level of objective justification"—a "less demanding standard than probable cause," but one that is not

satisfied by a mere "inchoate and unparticularized suspicion or hunch" of criminal activity. *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000) (quoting *Terry*, 392 U.S. at 27) (quotation marks omitted). In other words, "a 'gut' feeling . . . will not do." *Brown v. United States*, 590 A.2d 1008, 1014 (D.C. 1991). Nor will conclusory explanations devoid of particularized facts, especially where "the behavior of [the] suspect is capable of 'too many innocent explanations.'" *Duhart v. United States*, 589 A.2d 895, 899 (D.C. 1991) (quoting *United States v. Barnes*, 496 A.2d 1040, 1043 (D.C. 1985)); *see also Hawkins v. United States*, 248 A.3d 125, 131 (D.C. 2021). Whether reasonable articulable suspicion exists is a mixed question of law and fact. *Umanzor v. United States*, 803 A.2d 983, 991 (D.C. 2002). "[W]e defer to the trial court's factual findings unless clearly erroneous, and make an independent legal assessment as to whether there was reasonable suspicion for the stop." *Id.*

The government argues, as the trial court found, that Officer Kenney had reasonable suspicion that Maye was engaged in illegal activity based on (i) his hand movements, (ii) his presence in a high-crime area, and (iii) the pocketknife clipped to his pants. "[W]e view the evidence presented at the suppression hearing in the light most favorable to the prevailing party and draw all reasonable inferences in that party's favor." *Johnson v. United States*, 253 A.3d 1050, 1056 (D.C. 2021).

Considering these factors collectively, and drawing reasonable inferences in the government's favor, they fall short of the reasonable articulable suspicion necessary to justify a *Terry* stop.

### 1. Maye's Hand Movements Plus the High Crime Area

Officer Kenney testified that he "saw [Maye] with his hand doing something in his waistband" as if "he appeared to be manipulating something," and then put the same hand "in[to] his right front pant pocket." There is nothing particularly suspicious about adjusting or manipulating one's waistband in itself, an action perfectly consistent with "too many innocent explanations." *Duhart*, 589 A.2d at 899 (citation omitted); *see also In re A.S.*, 827 A.2d 46, 47-48 (D.C. 2003) (no reasonable articulable suspicion when officer observed an ambiguous "stuffing motion with [individual's] right hand into the waistband area"). For example, Maye could have simply been hiking up his pants, resetting his underwear, or adjusting his belt—a possibility expressly put to Officer Kenney at the suppression hearing, and which he could not discount. And "[p]utting one's hands in one's pockets . . . is a universal action which [can] hardly be called suspicious." *In re D.J.*, 532 A.2d 138, 142-43 (D.C. 1987) (abrogated on other grounds).

So we next consider what more is offered here to "fill the 'logical gap'" between [Maye's] hand motions and the suspicion that he might be" engaged in criminal conduct. *Robinson*, 76 A.3d at 338. Many of the more typical "gap fillers"—which our cases have sometimes noted in the seizure context, and at other times in the frisk context[1]—are absent. There was no "bulge" in Maye's waistband.[2] His hand gestures were not so peculiar as to suggest he was harboring something illegal.[3] The officers were "not responding to a report of criminal activity" or

---

[1] We draw from both strands of cases because there is no real daylight between the reasonable suspicion to seize and reasonable suspicion to frisk inquiries here. The only theory of criminal wrongdoing that Officer Kenney suggested he had suspicion of—and the only one the government now advances—is that Maye's possession of a pocketknife and waistband adjustments suggested he had an illegal firearm. If that suspicion were founded, it would seem to provide cause for both a seizure and a pat-down search.

[2] *See United States v. Bellamy*, 619 A.2d 515, 524 (D.C. 1993) (factor counseling against reasonable suspicion where officers did not "see any physical sign of a concealed weapon, such as a bulge in one of the appellees' clothing"); *Robinson*, 76 A.3d at 337 (stating there was no "testimony that [appellant] held any object or had any 'bulge' on his person that required concealing"); *Hawkins*, 248 A.3d at 131 ("officer did not claim to have seen a telltale bulge or any part of a weapon").

[3] *See, e.g.*, *Pridgen*, 134 A.3d at 304 (noting appellant's holding of his side as he ran, suggesting he possessed a gun); *Singleton v. United States*, 998 A.2d 295, 302 (D.C. 2010) (noting "appellant's awkward walk and hand movement that seemed to be protective of a firearm secreted in the pocket"); *Morgan v. United States*, 121 A.3d 1235, 1237-39 (D.C. 2015) (giving substantial weight to description that "suspect reached into the back of his pants and pulled something out and put it back in" (brackets omitted)); *In re Antonio A.*, No. B228573, 2011 WL 4436459, at *2 (Cal. Ct. App. Sept. 26, 2011) (noting that appellant "appeared to grab an object

"following-up on an informant's tip."[4] And Maye was not trying to conceal or shield his hand motions from Officer Kenney, contrary to the trial court's and the government's descriptions of his gestures as "furtive."[5] Officer Kenney made clear that Maye made no effort to hide what he was doing while adjusting his waistband.

That left the trial court to rely heavily on the fact that Maye was in a high-crime area. The mere fact that a neighborhood is high in crime may, in some circumstances, amplify otherwise suspicious activity. *See Brown*, 97 A.3d at 96 (noting "high-crime area" as contributing to reasonable suspicion to seize); *Wardlow*, 528 U.S. 124 (noting the "high crime area" as "among the relevant contextual considerations"). But it does not transform innocuous behavior like adjusting one's waistband and placing a hand in one's pants pocket into grounds for a seizure. *Duhart*, 589 A.2d at 900 ("[A]n allegedly 'high narcotics activity' area does not objectively lend any sinister connotation to facts that are innocent on their

---

in his waistband and pull it back and forth," which is "conduct consistent with carrying a concealed weapon").

[4] *Anderson v. United States*, 658 A.2d 1036, 1040 (D.C. 1995).

[5] *See, e.g.*, *Crowder v. United States*, 379 A.2d 1183, 1185 (D.C. 1977) (appellant's "attempt to shield the newspaper from view [was a factor] indicat[ing] the presence of a weapon"); *see also Robinson*, 76 A.3d at 337 (noting significance that "there was no testimony that [appellant] was trying to conceal anything").

face.”); *Curtis v. United States*, 349 A.2d 469, 472 (D.C. 1975) (facts do not “assume added significance because they happen to have occurred in a high crime area”); *Robinson*, 76 A.3d at 340 (“[T]he character of the streets . . . does not authorize officers to rove troubled neighborhoods and briefly detain and patdown anyone they encounter.”); *Dozier v. United States*, 220 A.3d 933, 943 n.12 (D.C. 2019) (cautioning against “over-reliance” on the “amorphous” term “high-crime area”). That is particularly true where the officers’ testimony about this being a high-crime area was short on specifics. Officer Jones’ testimony was that the officers had come into contact with more than one person in that block with narcotics and weapons. But where both officers had worked for the Metropolitan Police Department for more than five years, having confronted “multiple individuals” with guns and/or drugs on a block in that span does not provide much detail. And Officer Kenney described the entire Sixth District save for maybe a park and a “couple of little streets here and there” as being high in crime, thereby considerably diluting his view that this particular block was high in crime. We would need “a great deal more” than what the government offers here for the location of the encounter to tip the balance in its favor. *Curtis*, 349 A.2d at 472.

We are mindful that these factors are to be considered collectively under a “totality of the circumstances” test, *Umanzor*, 803 A.2d at 992-93, and that “[e]ven

if each specific act . . . could be perceived in isolation as an innocent act," there may yet be "a combination of facts that make out an articulable suspicion." *Peay v. United States*, 597 A.2d 1318, 1320 (D.C. 1991) (en banc). Nonetheless, we have repeatedly found a lack of reasonable suspicion despite similar hand gestures observed in high crime areas under circumstances more suspicious than what we have here. *See, e.g.*, *Duhart*, 589 A.2d at 899-900 (no reasonable articulable suspicion where officer saw "two people examining 'something'" in a high-crime area and, upon noticing the officer, the appellant "shoved [the] item into his pocket"); *Hawkins*, 248 A.3d at 127, 131 (no reasonable articulable suspicion where, upon seeing police officer, appellant stuffed one or both of his hands into his satchel "several times" while in an area that "had experienced 'an increase in violent crime' that summer"); *Anderson v. United States*, 658 A.2d 1036, 1040 (D.C. 1995) (no reasonable articulable suspicion when officer saw appellant in high crime area around midnight "reluctantly remov[ing] his hands from his pocket and act[ing] in an unusual manner").[6]

---

[6] *See also In re Jeremy P.*, 11 A.3d 830, 838 (Md. Ct. Spec. App. 2011) ("[A] police officer's observation of a suspect making an adjustment in the vicinity of his waistband does not give rise to reasonable suspicion sufficient to justify a *Terry* stop. Typically, to provide the reasonable and articulable suspicion necessary to warrant an investigative detention in the absence of other suspicious behavior indicating the possibility of criminal activity, the officer must be able to recount specific facts, in addition to the waistband adjustment, that suggest the suspect is concealing a weapon in that location.").

The government argues that *Peay*, *supra*, compels a contrary conclusion.  We disagree.  In *Peay*, the officers' suspicions that defendant possessed an illegal weapon rested on a stronger foundation than what we confront here.  We determined there was reasonable articulable suspicion in that case when officers pulled their car up to the entrance of an apartment building known for "narcotics trafficking," and the appellant, upon seeing the officers, "hurried" inside the building while clutching an object in his hand that officers suspected was an illegal weapon.  597 A.2d at 1319-22 & n.6.  By contrast, in this case Maye did not flee but cooperated with the officers who pulled their car up to his group of friends, parked it, exited, and approached with no specific cause.  There was nothing in Maye's hand that could be mistaken for a gun, nor was there any bulge or attempt to turn away from officers so as to suggest he was hiding something.  And he did not run inside any particular house or complex specifically known to be a hot-bed for criminal activity.  *Peay* is readily distinguishable.

### *2. The Pocketknife Clipped to Maye's Pocket*

The lone additional factor the government and trial court point to as creating a reasonable suspicion of criminal conduct is Maye's possession of a pocketknife, clipped inside his pants pocket with the clip in plain view.  We disagree with the trial

court's reasoning that possessing a "typical folding pocket knife" "carr[ies] with it an indici[um] of wrongdoing." People carry pocketknives for many reasons; anybody who has an occasional need to open packages, break down boxes, or cut string may find it useful to keep one at hand. Pocketknives may be carried "for utilitarian reasons" or "as a tool in certain trades or hobbies." *Scott v. United States*, 243 A.2d 54, 56 (D.C. 1968). A pocketknife is often listed first among the "ten essentials" that older Scouts (formerly, "Boy Scouts") are expected to carry on any outing. *See, e.g.*, Stephen Regenold, *The Scout 10 Essentials: Items Every Scout Needs in the Outdoors*, SCOUTING, scoutingmagazine.org/2013/02/the-10-essentials/; https://perma.cc/V7MZ-4NYR (last visited August 27, 2021). In short, individuals are allowed to carry pocketknives—and adjust their waistbands, including in high-crime areas—without forfeiting their Fourth Amendment rights to be free from seizures and searches absent more particularized suspicion.

We find the Second Circuit's opinion in *United States v. Hussain*, 835 F.3d 307 (2d Cir. 2016), instructive on the point. In that case, officers stopped a car for running a stop sign in a "high crime area" and the driver—later observed to have a pocketknife in his pocket—"started fumbling around the center console." *Id.* at 310, 315-16. One of the passengers in the car was also "sitting in an 'unnatural' position that suggested" he was trying to "block the officer's view of the inside of the car,"

*id.* at 311, 314, unlike in this case where there is no indication any of Maye's companions were acting suspiciously. The trial court found in *Hussain* that the above factors gave the officers reasonable articulable suspicion to permit a protective search of the car for other weapons. *Id.* at 312; *see generally Michigan v. Long*, 463 U.S. 1032, 1035 (1983) (extending *Terry*'s rationale to vehicular searches).

The Second Circuit reversed for reasons applicable here.[7] It determined that the trial court "overstated the description of the knife as a dangerous 'weapon' that signaled the presence of other weapons" because possession of a simple pocketknife did not support such an assumption. *Id.* at 317. In arriving at that conclusion, the court explained that carrying a standard pocketknife does not suggest a person is otherwise armed with an illegal weapon, as it observed that pocketknives with

---

[7] There is one potentially important difference between this case and *Hussain*, which is that *Hussain* concerned whether there was sufficient reason to *search* for dangerous weapons after a lawful seizure, whereas this case also presents the predicate question whether there was sufficient reason to *seize* Maye in the first place. *See Curtis*, 349 A.2d at 472 (protective pat-down may only be conducted if "the preceding seizure was reasonable"). But as discussed above in note 1, that point only helps Maye's cause. Even if we were to assume a lawfully stopped person with a pocketknife can invariably be patted down as potentially dangerous, we would still have the deficiency in this case that officers had no basis to stop Maye in the first place.

shorter blades—like the "Swiss Army knife" and "the official pocketknife licensed by the Boy Scouts of America"—are "ubiquitous."[8] *Id.*

Other courts tend to agree with the point that mere possession of a pocketknife, without more, does not give rise to reasonable articulable suspicion of criminal activity. *See, e.g.*, *People v. Brannon*, 949 N.E.2d 484, 487-88 (N.Y. 2011) (defendant's possession of a "typical pocket knife" did not support a finding of reasonable articulable suspicion); *Lockard v. State*, 233 A.3d 228, 241 (Md. Ct. Spec. App. 2020) (a pocketknife does not give rise to reasonable articulable suspicion that person is otherwise armed and dangerous); *Davis v. State*, 67 So. 3d 1125, 1127 (Fla. Dist. Ct. App. 2011) ("Possession of a pocketknife, without more, does not create a reasonable suspicion that a citizen is involved in criminal activity."); *Debord v. State*, 622 S.E.2d 460, 461-63 (Ga. Ct. App. 2005) (no reasonable articulable suspicion where officer knew appellant from "a previous narcotics violation" and "noticed a pocketknife 'clipped to his pants pocket'"). We reach the same conclusion here.

---

[8] *See generally* D.C. Code § 22-4514(b) (2012 Repl.) (treating knives "with a blade longer than 3 inches" as "dangerous weapon[s]").

This court's recent decisions in *Hawkins* and *Golden* are also instructive. In *Hawkins v. United States*, there was testimony that the defendant, who appeared nervous upon seeing a police officer, made stuffing motions into a satchel he was carrying. 248 A.3d at 127-28, 131. The arresting officer had indicated a trend that summer of persons hiding illegal firearms in similar satchels. *Id.* at 131. The government argued that the appellant's stuffing motions while present on a block experiencing "'an increase in violent crime' that summer," combined with the officer's knowledge that people were carrying firearms in satchels like his, provided the requisite suspicion for the officer to believe the defendant possessed an illegal firearm. *Id*. at 127, 131. We disagreed, reasoning that the "officer's conclusory reference to a 'trend' of finding guns hidden in satchels that summer was not supported by details which would allow the court to 'evaluate the reasonableness of th[e] . . . search.'" *Id.* at 131 (quoting *Terry*, 392 U.S. at 21). In *Golden v. United States*, officers observed the defendant wearing an "unneeded" sweatshirt around his waist which appeared to be covering a bulge on his right hip. 248 A.3d 925, 941-42 (D.C. 2021). The government argued that the location of the bulge, combined with the defendant's wearing of a sweatshirt on a warm day, triggered a reasonable articulable suspicion for officers to believe the defendant was armed with an illegal firearm. *Id.* We again disagreed, concluding that the officers' observations of the defendant were consistent with innocent behavior and were too generalized to

provide reasonable articulable suspicion under the Fourth Amendment. *Id.* at 942-43.

Officer Kenney's suspicions here were even more generic than the ones we confronted in *Hawkins* and *Golden*. He did not suggest there was a trend of people with pocketknives carrying firearms, like the asserted correlation between satchels and firearms noted in *Hawkins*. There was no bulge on Maye's waist suggesting a firearm, as there was in *Golden*. There was only a typical pocketknife, which—similar to the satchel in *Hawkins* and the sweatshirt in *Golden*—supplied no meaningful support for Officer Kenney's suspicion of criminal activity. "Mere conclusory statements by the officer that what he saw made him believe the defendant had a weapon [in his waistband] are not enough to satisfy the State's burden of articulating reasonable suspicion that the suspect was involved in criminal activity." *In re Jeremy P.*, 11 A.3d at 839.

Finally, we do not think the combination of (1) Maye putting a hand in his pocket (2) where a pocketknife was clipped, presents a tandem of factors more suspicious than the sum of its constituent parts. There is no reason to think Maye placing his hand in his pocket put him in a better position to draw the knife than if he had naturally rested his arm at his side—an equally innocuous posture. Officer

Kenney did not suggest otherwise and was explicit that he did not feel "threatened" by the pocketknife, further testifying that he could not even recall if he removed it during the course of patting Maye down. These two factors, in combination with the high-crime area and waistband adjustment, did not give rise to a reasonable articulable suspicion to seize Maye.

**B.**

Our conclusion above is not fatal to affirmance, however, as the government also contends that Maye was not in fact seized when he consented to a search. The government asserts the trial court itself found there was no seizure when Maye consented to a search, but that view cannot be reconciled with the trial court's ten separate references to the encounter as a "*Terry* stop" or a "stop under *Terry*." While we acknowledge the trial court at times suggested there was no seizure,[9] its ultimate

---

[9] The trial court's order first describes the officers' initial "interaction with the group of individuals [as] a consensual encounter" in Part I.A, and then describes how those "officers' interaction with Defendant was a valid *Terry* stop" in Part I.B. We read the trial court to have reasoned (1) that the officers' initial approach did not amount to a seizure of the entire group, but (2) at some point prior to receiving consent Officer Kenney seized Maye, perhaps when he asked Maye to remove his hand from his pocket, which might reasonably be interpreted as a command. *See Sharp*, 132 A.3d at 167 ("Courts routinely treat a request to step out of a car as interchangeable with an order or direction to get out of a car—a fact that strongly suggests that a reasonable person would likewise believe that an officer who asked

conclusion about that is of little consequence because whether there was a seizure is a question of law we review de novo and we "may affirm a decision for reasons other than those given by the trial court" so long as there is no "procedural unfairness to the parties." *Tuckson v. United States*, 77 A.3d 357, 360-61 (D.C. 2013).[10]

To determine whether Maye was seized at the time he agreed to a search, we ask whether a reasonable person in Maye's shoes would have felt "free to . . . terminate the encounter" with the officers. *Sharp*, 132 A.3d at 166 (quoting *Bostick*, 501 U.S. at 439). If so, then the encounter was consensual so that Maye's consent was valid and Officer Kenney could search him without intruding on his Fourth

---

him to get out of a car was not giving him a realistic right to say no.") (citations omitted). The trial court also described an "alternative[]" basis for its ruling, that Maye's "consent was entirely voluntary." But there is no question that if Maye had been illegally seized any consent would be a fruit of that illegal seizure, a point the government has never contested and which renders this not an alternative ruling at all, but one likewise dependent on whether Maye was in fact seized. The government has never suggested, for instance, that if Maye was illegally seized prior to giving his consent to the pat-down, his consent was "sufficiently attenuated by an independent act to dissipate the taint of the" illegal seizure. *Jones*, 154 A.3d at 598 n.20 (quoting *Oliver v. United States*, 656 A.2d 1159, 1172 (D.C. 1995)).

[10] The only tangible difference it might make is in determining which party is entitled to reasonable inferences in its favor. *See Morales v. United States*, 866 A.2d 67, 72 (D.C. 2005) ("[W]e are obliged to view the record in the light most favorable to sustaining the trial court's ruling.").

Amendment rights.[11] *Gordon v. United States*, 120 A.3d 73, 78 (D.C. 2015). If not, then this was an unlawful seizure and Maye's agreement to the search "would have been contemporaneous with and tainted by the illegal seizure, and 'thus insufficient to show consent.'" *See Dozier*, 220 A.3d at 947 n.18 (quoting *Jones*, 154 A.3d at 598 n.20). Whether a seizure occurred by the time Maye ostensibly consented to the search is thus crucial to whether Maye's motion to suppress should have been granted.

Unfortunately, the trial court's order again does not resolve discrepancies between Officer Kenney's and Hall's testimonies that are critical to this analysis, likely because it—incorrectly, in our view—thought a seizure was justified under *Terry* in any event. When this case was remanded in 2015, we instructed the trial court to resolve the differences between Officer Kenney's and Hall's versions of the events, because those were the two witnesses whom it generally credited. *Maye*, Mem. Op. & J. at 4. Because their accounts differed substantially and because the trial court found both witnesses credible, this court could not discern "what specific

---

[11] We caveat that we do not reach Maye's argument that the search exceeded the scope of his consent. The premise that he gave any voluntary consent is in doubt, and we think it imprudent to address that potentially moot point.

testimony the trial court credited in deciding that there was consent in this case." *Id.* (quotation marks omitted).

One of those key unresolved differences is whether the officers directed everyone in the group to put their hands on the car—a circumstance Hall and Maye testified to, but that was absent from Officer Kenney's testimony. While the trial court generally described how "[t]he officers did not make a show of authority or act in a manner that would dictate compliance by any member of the group was required," it said that was "undisputed even by the Defendant," suggesting it thought Maye's and Hall's accounts of the entire group being asked or directed to put their hands on the car was simply not coercive. Given the seeming significance of that fact, we do not opine on whether this was a seizure without a clear finding about it. Suffice it to say that a reasonable person in Maye's shoes might think it material, when assessing whether they are free to terminate a police encounter, if seven of their friends have likewise been directed to assume the position and then complied.

Because we remand—and further animating why we think it is prudent to do so—we note two factual points the trial court may have gotten wrong. First, the trial court suggested that when Officers Kenney and Jones approached the group, they "specified that no one in the group was in trouble." No one testified to that during

the suppression hearing, or at Maye's trial for that matter.[12] Perhaps the trial court was merely paraphrasing the officers' testimony that in fact nobody was in trouble—rather than suggesting they indicated as much to the group—but because that is unclear we flag the point. Second, the trial court found Maye's testimony that he "was ordered to place his hands on the . . . vehicle and was immediately handcuffed" not credible, in part, because it concluded that Hall's testimony did not corroborate Maye's. But Hall did corroborate Maye on that point. Hall testified that everybody in the group was directed to place their hands on the car, that Officer Kenney "grabbed" Maye, and then searched him after placing him in handcuffs. Their accounts were in sync.

## III.

We disagree with the trial court's conclusion that reasonable articulable suspicion justified a seizure of Maye. We remand the case for clearer factual findings relevant to whether and when Maye was in fact seized.

---

[12] *See Dozier*, 220 A.3d at 937 n.1 ("In reviewing the trial court's denial of a motion to suppress, we 'can consider all testimony from the suppression hearing and undisputed testimony from the trial.'") (quoting *Patton v. United States,* 633 A.2d 800, 818 n.11 (D.C. 1993)).

*So ordered.*